**UNITED STATES of America**

v.

**Gary L. GRIFFIN, Appellant.**

**No. 82–1138.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 21, 1982.

Decided May 13, 1983.

I. Michael Greenberger, Washington, D.C., for appellant. Russell B. Kinner, Washington, D.C., was on brief for appellant. Lynn E. Cunningham, Washington, D.C., also entered an appearance for appellant.

A. Patricia Frohman, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee. Kenneth M. Raisler, Asst. U.S. Atty., Washington, D.C., also entered an appearance for appellee.

Kenneth L. Mickens was on brief for Nat. Consumer Law Center, Inc., amicus curiae.

Before WILKEY and WALD, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

Opinion concurring in the judgment filed by Circuit Judge WILKEY.

McGOWAN, Senior Circuit Judge:

Gary Griffin defaulted on the federally-insured student loan a proprietary vocational school in Washington, D.C., gave him to pay for classes it offered in radio and television repair. As he told the school's collection agency, Griffin believes he has valid defenses that excuse him from any obligation to his school lender. According to Griffin, this school's salesmen used high-pressure tactics to sell empty dreams to Washington's poor and hopeless. He says the school was shamefully inadequate and that defaults like his were common because students often emerged with no marketable skills. The United States sued Griffin to recover the money it reimbursed the school after Griffin defaulted. The question presented on appeal is whether Griffin may raise against the government defenses he might have raised against the school in a suit to collect on the loan. The District Court granted summary judgment for the government, holding that Griffin could not raise any defenses because he failed to bring them to the Office of Education's (OE's) [1] attention before it paid the school's

default claim. Because we find that OE is bound by its own regulations to recognize any valid defenses Griffin might have, we reverse.

I

On October 4, 1975, Griffin applied for a federally-insured student loan to attend the Washington Drafting School, later known as Lacaze Academy, Technical Division, to take a course in radio and television repair. *See generally* Higher Education Act of 1965, tit. IV, pt. B, 20 U.S.C. §§ 1071 to 1087–4 (1976 & Supp. V 1981) (as amended) (guaranteed student loan program). After the school's financial aid officer signed the application, and OE approved the insurance, Griffin executed two promissory notes to secure the loan from the school: one, dated November 3, 1975, was for $862.50; the second, undated, was for $137.50. Griffin attended classes from October 1975 to October 1976. We will not dwell on Griffin's allegations about the inadequacies of his course of study or the misrepresentations of the school's salesman; suffice it to say that they strongly evoke Charles Dickens' immortal image of Dotheboys Hall as administered by Wackford Squeers.

By June 1978, when Griffin's payments became due and he defaulted, OE had run into some problems of its own with the Washington Drafting School. In both 1975 and 1977 it considered suspending or terminating the school's eligibility as an insured lender because a high proportion of loans the school made between 1974 and 1976 were either delinquent or in default. Record Excerpts (R.E.) 71. Indeed, in 1977 OE substantially reduced the school's lending limit and renewed its contract of insurance even to that extent only "reluctantly." R.E: 147.

OE had also learned of problems others were having with the school. At some point it received a copy of a 1975 Veterans'

---

1. 20 U.S.C. § 3441 (Supp. V 1981) transferred the functions of the Office of Education to the Secretary of the Department of Education. Because the Office of Education was in charge during most of the events relevant to this appeal, we will ignore the transfer of duties for purposes of this opinion and refer to OE throughout as the government agency vested with responsibility for the student loan program.

Administration audit of the Washington Drafting School. The audit found that the school was falsely certifying that chronically absent students were in fact in attendance. It also found violations of various Veterans' Administration regulations. R.E. 102–07. Moreover, between August 1977 and August 1978, Griffin's attorney and at least one law clerk from the Neighborhood Legal Services Program of Washington, D.C., had conversations or meetings with OE officials concerning various clients' problems with Lacaze-Gardner School, an entity comprising both Lacaze Academy, Technical Division, and a school teaching business skills, Lacaze-Gardner School, Inc. R.E. 185–89. In the spring of 1978, a law clerk specifically inquired "whether the Office of Education would permit students to raise defenses to repayment of federally-insured loans relating to the circumstances of enrollment and the educational program." R.E. 187 (affidavit of Griffin's attorney). In response, OE sent a copy of a bulletin announcing that a school run for profit is a "seller" for purposes of a Federal Trade Commission rule requiring consumer credit contracts to specify that subsequent holders are subject to the same claims and defenses as the original seller. R.E. 187–88; see 16 C.F.R. pt. 433 (1982) (FTC rule); R.E. 190–92 (OE Bulletin L16, June 28, 1976).

On August 11, 1978, the school wrote to inform OE that Griffin's account was past due. One week later OE sent Griffin a letter encouraging him to make repayment arrangements by writing the school's collection agency or by phoning the school's student loan director. R.E. 182. The letter said that if Griffin and the school could not agree on the amount owed, or "if there are other problems which you would like to discuss," Griffin could write to a regional office of OE. The letter's main message, however, was repeated at the end: "Please contact LACAZE ACADEMY as soon as possible." Id. On October 6, 1978, Griffin's attorney wrote to the school's collection agency as OE had requested. He stated that "Mr. Griffin wishes to present defenses to the entire amount due and owing" and that he would "be glad to set out Mr. Grif-

fin's defenses in detail if you will kindly inform me as to whom this information should be directed." R.E. 183.

By this time Lacaze-Gardner, Inc., the business school affiliate of the technical school, was amid a brewing scandal. Beginning in late August, the *Washington Post* ran a series of articles describing the business school as a rat-infested firetrap and reporting an OE investigation into allegations that the school collected loan money for many students who never completed their course work. By November the articles reported a wide range of alleged deceptions and asserted that the Federal Bureau of Investigation was starting its own investigation. Finally, on the day two of the most condemnatory articles appeared, the school was closed for fire code violations after two "suspicious" fires broke out. R.E. 173. The next day, November 10, OE instituted emergency action to terminate both Lacaze schools' eligibility under the federal loan program because their local licenses to operate as proprietary schools had lapsed on October 31, 1978. R.E. 161–62.

On November 16, 1978, the technical school submitted a claim to OE, the insurer of the loan, for reimbursement of its loss due to Griffin's default. At the same time, it assigned all its rights in the promissory notes to the government. Even though it was required by regulation to submit with its claim copies of all documents relating to its collection efforts, see 45 C.F.R. § 177.-48(c) (1978); see also 34 C.F.R. § 682.-516(e)(1)(ii)(D) (1982) (amended current version), it did not supply OE a copy of Griffin's letter to the collection agency in which he announced his intent to raise defenses on the loan. OE paid the default claim on December 7, 1978.

The government then sent some collection notices of its own. In June 1979 Griffin's attorney wrote to object to the government's collection tactics and to announce that Griffin and another student had "many good and sufficient defenses based on misrepresentations and inadequate services by Lacaze-Gardner." R.E. 61. Although an agency official wrote in response that some

of the violations Griffin's attorney had listed would not be valid defenses, he did not assert at that time that the government was immune to any defenses not previously raised. Instead, he said the agency was

> quite sensitive to bona fide defenses honestly raised by debtors who are willing to discuss facts with us. If the debtors you represent can prove a defense on the debt, we will pursue the matter with the lender, which has warranted to us that the note qualifies for payment on the federal loan insurance.

R.E. 59.

## II

On September 4, 1980, the government filed suit in the District Court to recover the balance due on the defaulted loan. Griffin asserted defenses based on the school's alleged inadequacies: breach of contract, illegal contract, and fraud or violation of District of Columbia consumer protection rules. The government, however, retreating from the position it espoused earlier, argued that Griffin could not raise any defenses to payment of the loan. Central to the government's contention was its characterization of the rights it was asserting against Griffin.

All agreed that one source of the government's rights against Griffin was its position as holder of the promissory notes. Upon payment to the school, the government became "subrogated for all of the rights of the holder of the obligation upon the insured loan and ... entitled to an assignment of the note." 20 U.S.C. § 1080(b) (Supp. V 1981). Were its rights so limited, however, the government would have been in no better position than the school itself. As OE made clear, "[i]f the

school fails to provide such education, the student has defenses on the [school-generated] loan. Because a subsequent holder of a school-originated loan is not a 'holder in due course,' such holder is subject to the same defenses or defects as the original lender." 41 Fed.Reg. 4496, 4497 (1976); *accord* 40 Fed.Reg. 7961 (1975) (interpreting statutory rights of insurance beneficiaries); 44 Fed. Reg. 53,866, 53,913 (1979) (discussing newly-promulgated 45 C.F.R. § 177.513, now codified at 34 C.F.R. § 682.513 (1982)). Lenders who bought school-originated loans were given "the responsibility of making prudent professional judgments about the quality of such loans including the practices and financial stability of the schools originating the loans." 41 Fed.Reg. at 4496–97. Indeed, as OE informed Griffin's attorney, OE announced in June 1976 that schools run for profit were subject to a Federal Trade Commission rule requiring consumer credit contracts to bear a large boldface legend: "ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF." 16 C.F.R. § 433.2(a) (1982); *see* R.E. 190–92 (OE Bulletin L16).[2]

To free itself from the need to contest Griffin's defenses, therefore, the government contended it had rights against Griffin independent of its subrogated rights from the school. It insisted that it could assert a right to reimbursement derived from its status as Griffin's surety or guarantor.[3] In the government's view, Griffin requested the government to answer for his

---

**2.** Griffin also asserts that consumer defenses are preserved by various laws of the District of Columbia. *See* D.C.Code Ann. § 28–3808 (1981) (assignees of rights from consumer credit sales subject to defenses); D.C. R. & Regs. tit. 5GG, § 3.2(b) (1972) (requiring legend on instruments of indebtedness to proprietary schools).

**3.** Nothing relevant to this appeal turns on the distinction between a surety and a guarantor. The main difference between the two is that a

surety's obligation is not conditioned on the principal's default but is a direct promise to perform; a guarantor's obligation arises only upon the principal's failure to perform. *See* L. SIMPSON, SURETYSHIP §§ 3, 5, 14 (1950); A. STEARNS, THE LAW OF SURETYSHIP § 1.5 (J. Elder 5th ed. 1951). The Restatement of the Law of Security uses the terms interchangeably, *see* RESTATEMENT OF THE LAW OF SECURITY § 82 comment g (1941), and we will do the same.

default to the school when he signed the application form, which stated, "I hereby apply for a loan under the Federal Insured Student Loan Program to help pay my expenses while attending school." R.E. 36. The government thus argues it became Griffin's surety or guarantor with his full consent. When a consensual surety pays the principal's obligation, it is entitled to reimbursement subject only to the principal's defenses on the obligation *known* to the surety when it paid the creditor. *See United States v. Schmittmeyer*, 325 F.2d 987 (2d Cir.1963); RESTATEMENT OF THE LAW OF SECURITY, *supra* note 3, § 108(1)(b); L. SIMPSON, *supra* note 3, § 48.

The District Court endorsed this view of the government's rights against Griffin and thus saw the issue as the narrow one of "whether OE was aware of any defenses that defendant might have raised when the loan was paid in December 1978." *United States v. Griffin*, 530 F.Supp. 604, 606 (D.D. C.1982). The court answered this question in the negative. Regardless of what Griffin told the school's collection agency, he did not tell the government about his complaints before OE paid the claim. The court construed the affidavits from Griffin's attorney and from the attorney's law clerk as not specifying whether those persons discussed Griffin's individual complaints in their meetings with OE officials. Moreover, the court found persuasive affidavits from OE officials who recalled that these meetings discussed only the problems

of students then enrolled in the school. As for the rest of the information OE received about the school, the court found it relevant to problems after Griffin left in October 1976 or not "conclusory of any defenses that defendant might have."[4] *Id.* The court thus granted summary judgment in the government's favor.

### III

Without expressing any view whether Griffin's defenses are valid, we hold that he is entitled to raise them and accordingly we reverse the District Court's award of summary judgment. The District Court was not made aware of an OE regulation that unambiguously bars the agency from collecting against a student who has a valid defense on the loan. Because the agency has thus surrendered this particular right in a surety's quiver, we do not decide the extent to which the Higher Education Act of 1965 would otherwise permit the government to assert the rights of a surety in collection suits.[5]

34 C.F.R. § 682.518 (1982) reads in part:

After paying a default claim on a FISLP loan, the Secretary attempts to collect from the borrower and any valid endorser in accordance with the Federal Claims Collection Standards (4 CFR Parts 101–105). The Secretary attempts collection of all unpaid principal and accrued interest, except in the following situations:

**4.** On appeal OE also urges that much of the information in its possession before December 1978 concerned Lacaze-Gardner, Inc., the business school, rather than Lacaze Academy, Technical Division.

**5.** Judge Wilkey intimates in his separate concurrence that the statute not only *permits* the government to assert a surety's right to be free from unknown defenses but might even *require* it to do so. We explain in text why we disagree with the latter conclusion; we feel constrained to note here that even the former is open to dispute. Although the statute describes in some detail the government's rights and obligations under the student loan program, it makes no mention of rights the government has as a surety or guarantor. If the government nonetheless retains such common law rights, it does so only to the extent those rights are harmonious with the statutory scheme. It may well be, as some courts have held, that it does no violence to the statute to characterize the agency's rights against a student, for purposes of determining when the statute of limitations begins to run, as a surety's right to reimbursement. *E.g., United States v. Frisk*, 675 F.2d 1079 (9th Cir.1982) (per curiam); *United States v. Bellard*, 674 F.2d 330 (5th Cir.1982); *United States v. Lujan*, 520 F.Supp. 282 (D.N.M.1980); *United States v. Wilson*, 478 F.Supp. 488 (D.Pa.1979). Whether it offends the statute for the government to assert the additional right to ignore student defenses—especially if the government could still collect against the offending lender—is another question altogether, and one we have no cause to address at this time.

(a) *The borrower has a valid defense on the loan.* In this situation, the Secretary refrains from collection against the borrower or endorser to the extent of any defense that either may have.

This regulation received almost no discussion in the briefs submitted on appeal and was not mentioned in the District Court's opinion. Our questioning of counsel for both sides at oral argument, however, revealed no reason why the regulation does not dispose of this appeal, and we can find none. We will first explain why there is every reason to think the regulation means just what it says. We will then explain why nothing in the timing of when the regulation became effective excused the District Court from applying the regulation to the case before it.

OE regulations in effect when the government paid the school's default claim provided that when OE pays such claims to lenders it "shall take cognizance of" and "shall deduct" amounts attributable to defenses the student may have on the loan. 45 C.F.R. § 177.52 (1978). The government argued, however, that OE was obliged to do so only when the student brought defenses to its attention and that it was under no obligation to inform students of their right to alert OE of their defenses. Moreover, the government argued that its rights as a surety or guarantor meant that a student who brought defenses to the government's attention only after it paid a default claim would lose them forever.

■ Section 682.518 is significant because it explicitly says that *after* paying a default claim OE will still *refrain from collection* against the student to the extent he has a valid defense on the loan. 34 C.F.R. § 682.518 (1982). The language is plain and unqualified. It does not prevent collection to the extent of any defenses a student "brought to the government's attention before it paid the default claim"; it prevents collection to the extent of any defenses the

student "may have." This is in addition to the regulation providing that OE deduct amounts attributable to defenses from any default claims it pays. *See* 34 C.F.R. §§ 682.513(c)(1), .517(c) (1982). Thus, the regulations protect student defenses both before and after the government pays a default claim.

The statute, the regulations, and statements of agency policy all support the view that this regulation means precisely what it says. In the first place, the statute explicitly provides that OE may exercise "forebearance [sic] . . . in the enforcement of the insured obligation *after payment* on that insurance." 20 U.S.C. § 1080(c) (Supp. V 1981) (emphasis added). It also provides that OE may "compromise, waive, or release any right, title, claim, lien, or demand, however acquired." *Id.* § 1082(a)(6) (1976). Thus, even if the statute would otherwise permit the government to assert certain rights of a surety or guarantor against a student, it also provides that OE may by regulation decline to enforce those rights in the larger interests of the student loan program.

Far from conflicting with the aims of the statute, this policy is a logical outgrowth of the program's purposes. A policy of recognizing student defenses in no way means that the government will regularly bear losses on these loans. Normally, the government can turn around and recover from the lender default claims paid on obligations not in fact owed. Griffin's case is unusual only because his school has closed, and indeed was closed before the government paid the school's claim.[6] The fact that reimbursement from the school might be difficult or impossible in this particular case, however, does not impugn OE's general policy of letting students raise defenses in suits brought by the government. OE's decision to preserve defenses seems a sound way to protect the interests of student bor-

---

**6.** The record does not reveal the extent to which the Lacaze-Gardner School still has assets that could satisfy a judgment in the government's favor. The government appears to have some hope, however, for it has brought

a $1 million action against Lacaze for loan overpayments unrelated to Griffin's complaints. *See United States v. Lacaze-Gardner School, Inc.,* C.A. No. 79–293 (D.D.C. filed Jan. 30, 1979).

rowers and to deter lenders from abusing the program.

Indeed, the policy is one of fairly long standing. Section 682.518 merely codifies a policy proclaimed by Secretary of Health, Education, and Welfare Weinberger, and Commissioner of Education Bell, in a series of letters to the Attorney General of Texas in 1975 and 1976. Those letters made clear that OE intended to assert against students rights no greater than those of any other holder of the loan. Secretary Weinberger explained:

[W]hen the United States acquires the note as subrogee, it cannot become a holder in due course and, under the laws of most states, is subject to any defenses the student may have against the holder of the loan.

For this reason, it is the Department's policy to take cognizance of the student's assertions of a defense and not knowingly attempt to collect from a student when he has a valid defense.

R.E. 196. Commissioner Bell reiterated the point: "We can assure [the Texas Attorney General] that the Office of Education will not attempt to collect loans from FISLP borrowers to the extent that such borrowers have legal defenses on their loans, and such defenses would of course include fraud by the original lender, whether or not that lender was a school." R.E. 203. That the policy was well established is reflected in OE's correspondence with Griffin in 1979. Even after the agency had paid the claim, it expressed a willingness to hear valid defenses Griffin might have. It was only at trial, and as far as the record shows for the first time, that the agency contended Griffin waived defenses he did not bring to the government's attention before it paid the default claim.

It is worth noting that the government's policy is even more generous than merely permitting students to raise against the government defenses they could raise against *holders* of the notes. In some circumstances the government will forego collection against the student for defenses he has against his school but not against his

non-school lender. In such cases, the government honors a student's defense even though the defense does not reduce the amount it is obliged to pay on a default claim. For instance, if a school owes a student a refund on part of his tuition, OE will deduct the amount of the refund from default claims filed by school lenders or their assignees, but will not do so for claims filed by nonschool lenders. *See* 34 C.F.R. § 682.517(e) (1982). In other words, a student has no defense against his bank lender simply because his school has improperly withheld money it owes him. Nonetheless, OE regulations specify that OE will not collect against *any* student whose school owes him a refund. 34 C.F.R. § 682.518(b) (1982). Instead, the student merely assigns his right to the refund to the government, *id.*, and presumably the government then undertakes to extract the refund from the school.

Given this well-established policy of forbearance, there is no cause to read an exception into the plain language of the regulation for students who failed to bring their defenses to the government's attention before it paid a default claim. It is of some importance in this particular case, however, that the government made no effort to have Griffin present his defenses before it paid the default claim. Although OE's letter to Griffin mentioned that he could write a regional office if there were "other problems which you would like to discuss," R.E. 182, the letter never alluded to the raising of defenses and certainly did not warn Griffin that he would lose defenses he failed to bring to OE's attention. Rather, the letter's main message was that Griffin should get in touch with the school's collection agency, which is precisely what he did. Griffin told the collection agency he had defenses on the loan, and had the school followed agency regulations and submitted all documents concerning collection efforts when it filed its default claim, OE would have known of Griffin's defenses before it paid the claim. *See* 45 C.F.R. § 177.48(c) (1978). Therefore, we have no occasion to interpret how section 682.518 would affect collection efforts against a student who ig-

nored reasonable efforts by the government to have defenses presented in some orderly way or according to some reasonable time-table after explicit warning of appropriate consequences that might accompany non-compliance.

## IV

Griffin's counsel and the District Court might have overlooked section 682.518 because it did not become effective until October 21, 1979—after the government paid the school's default claim. See 45 C.F.R. pt. 177, at 332 (1979) (effective date).[7] The regulation was effective, however, long before the government brought suit on September 4, 1980, and was explicitly applicable to loans outstanding on the effective date. 44 Fed.Reg. 53,866 (1979). Because the collection suit and the government's efforts to foreclose Griffin's defenses came after the rule was effective, application of this regulation to prevent collection on Griffin's loan to the extent he has valid defenses would not be an application to "actions previously taken by lenders, schools, students or guarantee agencies," id., which actions are generally excluded from the coverage of the newly-promulgated rules.

It is true that, as an example of the inapplicability of the new rules to actions "previously taken," OE said that the "[n]ew collection requirements for FISLP loans apply only to loans for which the borrower is not delinquent in making a payment as of the regulations' effective date." Id. The regulation directing the government to honor student defenses, however, is not one of the "collection requirements" to which the example refers. Those requirements obviously pertain to efforts beginning at the time of the borrower's delinquency, e.g., 34 C.F.R. § 682.511 (1982) (lender duty to use due diligence in collection). The directive for the government to honor student defenses applies explicitly to its collection efforts begun after a claim has been paid, a

time well after the student's initial delinquency.

One might nonetheless try to argue that this regulation applies only to loans with default claims paid after the rules took effect. The new rules did not subject a lender to any new collection requirements for loans already delinquent and perhaps under collection. By analogy one could assert that they should not subject the government to any new policies once it has paid a particular default claim and has perhaps begun collection efforts, even if one phase of those collection efforts (the lawsuit) began only after the new regulations took effect.

Such an argument, however, would be strained at best. In the first place, as we have explained, this regulation was not a new policy at all, but rather a codification of a policy the agency had proclaimed for several years. Thus, the considerations that might justify a generous phase-in for new requirements imposed on private parties have no relevance to this particular policy. Moreover, the evident purpose of the rule is to ensure that students are not forced to repay loans for which they have valid defenses, even if this means the government will run some risk of not being reimbursed for a default claim it has already paid a school. Even if the government decided for the first time to adopt such a policy only after it paid Griffin's default claim, it is hard to see why this policy would be any less compelling in guiding the government's collection efforts against Griffin than against students whose default claims were yet to be paid. We therefore find that the regulation was fully applicable before the government brought suit against Griffin.

## V

Under the circumstances OE is bound by regulation not to collect against Griffin to the extent he has any valid defenses on the

7. The rule was part of a revision announced in the Federal Register Sept. 17, 1979, that took effect 45 days after it was transmitted to Congress. 44·Fed.Reg. 53,866 (1979). The revisions were originally codified in 45 C.F.R. pt. 177, but recodified in 1980 at 34 C.F.R. pt. 682, see 45 Fed.Reg. 77,368, 77,369 (1980).

loan. Having surrendered any right it might otherwise have had to reimbursement free from Griffin's defenses, it was not entitled to summary judgment. Accordingly, we reverse the District Court and remand for further proceedings consistent herewith.

*It is so ordered.*

WILKEY, Circuit Judge, concurring in the judgment:

Under the Guaranteed Student Loan Program, Title IV–B of the Higher Education Act, 20 U.S.C. §§ 1071—1087–4 (1976), the government undertakes to answer for the debt of student borrowers in case of default. The government's obligations under this program "bring it squarely within hornbook definitions of a guarantor." *United States v. Bellard,* 674 F.2d 330, 333 (5th Cir.1982). *Accord United States v. Frisk,* 675 F.2d 1079, 1082–83 (9th Cir.1982) (per curiam). As Judge McGowan's opinion acknowledges, when a guarantor pays the principal's obligations, "it is entitled to reimbursement subject only to the principal's defenses to the obligation *known* to the surety when it paid the creditor." Majority Opinion, *supra* at 1481.

I seriously question whether the provisions of the Higher Education Act cited by Judge McGowan, which permit the Office of Education (OE) to exercise forbearance or waive claims *in individual cases,* 20 U.S.C. §§ 1080(c) & 1082(a)(6), also permit the OE to throw away by general regulation all its statutory rights as a guarantor. The statute fully protects the government's rights as a guarantor; the regulation abandons them.

At any rate, we need not reach this question to resolve the case at hand. Gary Griffin had defenses to raise, and he raised them prior to payment according to instructions in a personal letter sent to him by the OE. His defenses were thereby preserved. With this ground of decision readily available, I find it unnecessary to make broad pronouncements concerning the scope and efficacy of a regulation discussed neither by the parties to this proceeding nor by the

district court below. Accordingly, I concur in the result only.