168 F.3d 1362
 335 U.S.App.D.C. 62, 133 Ed. Law Rep. 39
 Vanessa ARMSTRONG, Appellant,
v.
ACCREDITING COUNCIL FOR CONTINUING EDUCATION AND TRAINING,
INC., et al., Appellees.
 No. 97-5316.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 2, 1998.
Decided March 23, 1999.
 
 Appeal from the United States District Court for the District of Columbia (No. 91cv03135).
 Michael E. Tankersley argued the cause for appellant. With him on the briefs was Alan B. Morrison.
 Anthony M. Alexis, Assistant U.S. Attorney, argued the cause for appellee Richard Riley, Secretary of Education, et al. With him on the brief were Wilma A. Lewis, U.S. Attorney, R. Craig Lawrence and Scott S. Harris, Assistant U.S. Attorneys.
 Henry S. Weinstock argued the cause and filed the brief for appellees Bank of America, N.T. & S.A., et al.
 Mark E. Shure argued the cause and filed the brief for appellee Educational Credit Management Corporation.
 Before: HENDERSON, RANDOLPH and TATEL, Circuit Judges.
 Opinion for the Court filed by Circuit Judge TATEL.
 Concurring statement filed by Circuit Judge HENDERSON.
 TATEL, Circuit Judge:
 
 
 1
 In this case, we must decide whether appellant, a student who attended a for-profit vocational school with help from a federally guaranteed student loan, may assert the school's alleged fraud and failure to provide the education it promised as a defense against the lender's effort to collect the loan. Although federal student loan policy now recognizes school misconduct defenses against lenders who have "referral relationships" with for-profit schools, appellant obtained her loan in the late 1980s, a time when federal policy protected lenders from such defenses. Because we find no basis for applying the new standards retroactively to appellant's loan, we affirm the district court's dismissal of her claims for declaratory and injunctive relief.
 
 
 2
 * Established by the Higher Education Act of 1965, the Guaranteed Student Loan Program provides interest rate subsidies and federal insurance for private lenders to make student loans. See 20 U.S.C. § 1078(a), (c) (1994).* To raise funds to make, i.e., "originate," additional loans, original lenders sell loans to other lenders on a secondary loan market. So-called "guaranty agencies" guarantee the loans, paying loan holders the amounts due and taking assignment of the loans if students default. See id. § 1078(c). The Secretary of Education "reinsures" the loans and ultimately reimburses guaranty agencies on a sliding scale. See id. § 1078(c)(1). Although guaranteed student loans often change hands many times, they are not considered negotiable instruments; neither repurchasers nor assignees become "holders in due course." See Jackson v. Culinary Sch., 788 F.Supp. 1233, 1248 n. 9 (D.D.C.1992), rev'd on other grounds, 27 F.3d 573 (D.C.Cir.1994), vacated, 515 U.S. 1139, 115 S.Ct. 2573, 132 L.Ed.2d 824, on reconsideration, 59 F.3d 254 (D.C.Cir.1995). Instead, subsequent holders assume loans subject to all claims and defenses available against original lenders. Cf. 34 C.F.R. § 682.508(c) (1988).
 
 
 3
 Students may use federally guaranteed student loans to attend "eligible" schools, including for-profit vocational schools. See 20 U.S.C. § 1085(a)(1) (1988). To establish eligibility, vocational schools must be accredited by a nationally recognized accrediting agency. See id. § 1085(c)(4). The Secretary requires eligible schools to perform certain functions to facilitate student access to guaranteed loans, including giving students information on loan availability, certifying student eligibility to participate in the federal loan program, and forwarding applications to lenders. See 34 C.F.R. §§ 668.41-.43, 682.102(a), 682.603 (1988).
 
 
 4
 Federal student loan policy has undergone two significant changes relevant to this case. The first began in 1979 when Congress amended the Higher Education Act to encourage lenders to market loans to for-profit vocational school students. See Higher Education Technical Amendments of 1979, Pub.L. No. 96-49, 93 Stat. 351. The 1979 amendments removed a ceiling on the federal interest subsidy paid to participating GSLP lenders, "making proprietary school loans, which had previously been considered as too risky, more attractive." S.REP. NO. 102-58, at 6 (1991) ("Senate Report"). Later amendments removed other limitations on student borrowers attending for-profit schools, increased aggregate loan limits, and allowed students who had not completed high school to use GSLP loans to attend accredited postsecondary schools. See Education Amendments of 1980, Pub.L. No. 96-374, 94 Stat. 1367; Higher Education Amendments of 1986, Pub.L. No. 99-498, sec. 425, § 1075(a), 100 Stat. 1268, 1359; id. sec. 481, § 1088, 100 Stat. 1268, 1476.
 
 
 5
 To further encourage private lenders to make vocational school student loans, Congress excluded GSLP loans from the Truth in Lending Act ("TILA"). See Pub.L. No. 97-320, sec. 701(a), § 1603, 96 Stat. 1469, 1538 (1982). As a result, the Federal Trade Commission stopped enforcing various TILA regulations against GSLP lenders, including the "Holder Rule." Adopted by the FTC in 1976, the Holder Rule requires purchase money loan agreements (loans supplying money for the purchase of goods or services) arranged by sellers to contain a notice to all loan holders that preserves the borrower's ability to raise claims and defenses against the lender arising from the seller's misconduct. See 16 C.F.R. § 433.2(a) (1998). For example, if a used car dealer who fraudulently sells a lemon also arranges the buyer's financing through a bank, the buyer may rely on the dealer's fraud as a defense against repaying the bank loan. Ending enforcement of the Holder Rule with respect to GSLP loans thus had the effect of protecting lenders from claims and defenses students could raise against their schools.
 
 
 6
 This lender protection from student suits had one major exception: where lenders delegated to schools "substantial functions or responsibilities normally performed by lenders before making loans." 51 Fed.Reg. 40,890 (1986); 34 C.F.R. § 682.206(a)(2) (1988). In such cases, the Department of Education's "origination policy" kicked in, treating the schools--not the banks--as the lenders that had effectively made the original loans. See 34 C.F.R. § 682.200(b) (1988). As a result, all subsequent loan holders (remember, there are no holders in due course) were subject to claims and defenses that students could raise against their schools. Cf. id. § 682.508(c). But so long as lenders avoided school origination relationships, they could make and sell loans without fear that students could assert school misconduct as a defense against repaying their loans.
 
 
 7
 These changes in the Guaranteed Student Loan Program accomplished their purpose. Lending to for-profit school students mushroomed, increasing more than six-fold between 1982 and 1988. See Senate Report at 6-7. The changes also had unintended consequences. As a result of the GSLP's easy source of funding, large numbers of for-profit schools sprang up, admitted poorly prepared students, and offered shoddy programs. See id. at 2-3, 8-13. Graduates of these schools were often unable to get jobs. Default rates climbed dramatically, rising as high as 39%. See id. at 2. Because loan guaranty agencies were unable to keep up with growing default rates, many had to be bailed out by the Secretary. See, e.g., id. at 22.
 
 
 8
 In order to curb high default rates and protect students from for-profit school abuses, Congress initiated a second round of changes to the Guaranteed Student Loan Program in 1992. One change directed the Secretary to terminate GSLP eligibility of for-profit schools with consistently high default rates. See Pub.L. No. 102-325, sec. 427(a), § 1085, 106 Stat. at 549 (redefining "eligible institution" to exclude schools with excessive default rates). As a result, many for profit schools were eliminated from the program.
 
 
 9
 Congress also directed the Secretary to develop a "Common Guaranteed Student Loan Application Form and Promissory Note" specifying the contractual terms governing guaranteed student loans, and to study the possibility of permitting students to raise fraud-based state law defenses against repayment of student loans. See id. § 425(e), 106 Stat. at 546; id. § 1403, 106 Stat. at 817. Responding to these directives, the Secretary prepared a common promissory note and included in it a provision modeled on the FTC Holder Rule that was directed specifically at lenders affiliated with for-profit schools. See U.S. DEP'T OF EDUC., APPLICATION AND PROMISSORY NOTE FOR FEDERAL STAFFORD LOANS (SUBSIDIZED AND UNSUBSIDIZED) AND FEDERAL SUPPLEMENTAL LOANS FOR STUDENTS (SLS) (1993) ("Common Promissory Note"). In fact, one year earlier the FTC had renewed enforcement of the Holder Rule with respect to GSLP loans. See, e.g., Letter from Jean Noonan, Associate Director for Credit Practices, Federal Trade Commission, to Jonathan Sheldon, National Consumer Law Center (July 24, 1991) ("FTC Opinion").
 
 
 10
 Treating GSLP lenders like banks that allow used car dealers to arrange financing, the Holder Rule notice the Secretary included in the common promissory note, together with the FTC's renewed enforcement policy, made GSLP loan holders "subject to all claims and defenses" that the student borrower could raise against the school. Common Promissory Note. The notice applies where the loan is "used to pay tuition and charges of a for-profit school that refers loan applicants to the lender or that is affiliated with the lender by common control, contract or business arrangement." Id. (emphasis added). According to the Department, "refers" means that a school, with a lender's knowledge, goes beyond "giv[ing] its students information on the availability of student loans" and "recommend[s] that the applicants seek loans from [a particular] lender." U.S. DEP'T OF EDUC., OVERVIEW, FEDERAL TRADE COMMISSION (FTC) HOLDER RULE 2, 3 (July 2, 1993) ("Overview, FTC Rule"). A school also "refers" loan applicants when it "contact[s] a particular lender to inquire whether that lender would be willing to make loans for its own students, and later include[s] this lender (if it responded positively) on its information list of lenders." Id. at 2. No referral relationship exists where a school simply "obtain[s] its lender information from third-party sources ... or from a more generalized school inquiry to a lender (e.g., asking merely whether the lender is generally willing to make loans to trade school students in a particular state.)." Id. Although the common promissory note's Holder Rule notice expands lender liability beyond that authorized by the Department's origination policy, the Department has made clear that even under the notice's lower threshold, lenders may protect themselves from school misconduct defenses by limiting their cooperation with schools to the few obligations mandated by the Higher Education Act and implementing regulations (i.e., providing students with information on loan availability, certifying student eligibility, and forwarding applications to lenders). See DEP'T OF EDUC., FEDERAL TRADE COMMISSION (FTC) HOLDER RULE: QUESTIONS/ANSWERS 4 (July 27, 1993); 34 C.F.R. § 682.206 (1997).
 
 
 11
 The loan at issue in this case was made in 1988, during the time when federal student loan policy encouraged lenders to make GSLP loans to vocational school students and prior to inclusion of the Holder Rule notice in GSLP promissory notes. Appellant Vanessa Armstrong was recruited by National Business School, a for-profit vocational school operating in Washington, D.C., to enroll in its automobile mechanic training program. With help from the school, Armstrong obtained a $4,000 GSLP loan from the First Independent Trust Company of California ("FITCO"). One of the largest sources of loans for students attending for-profit schools in the late 1980s, FITCO was singled out for its abuse of the Guaranteed Student Loan Program during the hearings that led to the 1992 revamping of federal student loan policy. See Senate Report at 21-24, 28.
 
 
 12
 According to Armstrong, a National Business School representative prepared her loan application, specified the type of loan, determined the loan amount, prepared the promissory note, selected FITCO as the lender, presented the loan agreement to Armstrong to sign, and forwarded the loan application and promissory note to FITCO. See Am. Compl. pp 22, 24. Printed on standard forms provided by FITCO's guaranty agency, the promissory note contained a choice of law clause that subjected the loan contract to the laws of the state of the lender, in this case California. Like other student loan promissory notes issued at the time, the note contained no Holder Rule notice. Armstrong alleges that the school and its accrediting agency, the Accrediting Council for Continuing Education & Training, Inc. ("ACCET"), represented that the school offered a nationally accredited program in 1988; in fact, she claims, its accreditation had expired a year earlier. See id. pp 2, 29-34.
 
 
 13
 Armstrong claims that National Business School failed to provide the promised training, equipment, and job placement services, "leaving [her] and other students to repay student loans for an education that they never received." Id. p 2; see also id. p 77. The school closed its doors in 1990 and filed for bankruptcy. Although the school had charged each student over $5,000, Armstrong and other former students who filed claims in the bankruptcy proceedings each recovered only $900. See Compl. p 26.
 
 
 14
 Armstrong filed suit in the United States District Court for the District of Columbia, asserting federal claims based on the FTC Holder Rule and the Department's school origination policy, as well as pendant state law claims based on the District of Columbia Consumer Credit Protection Act ("CCPA") and common law contract doctrines. The complaint sought damages, restitution, and declaratory relief against ACCET and each of the entities that could enforce the loan, all appellees in this case: Bank of America,N.T. & S.A. (the current loan holder); California Student Loan Financing Corporation (a corporation that acquires student loans on the secondary market and that directed Bank of America to purchase Armstrong's loan as its trustee); the Secretary of Education (who assumed the guarantee of Armstrong's loan after the original guarantor became insolvent); and Educational Credit Management Corporation (a corporation created by the Department to manage loan guarantees assumed by the Secretary). Dismissing her federal claims, the district court held that no cause of action arises under the Department's school-origination policy or the FTC Rule. See Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc., 832 F.Supp. 419, 432 (D.D.C.1993) ("Armstrong I"). Armstrong now concedes this point. The district court also dismissed Armstrong's state law claims except her common law fraud and misrepresentation claims against ACCET. See id. at 425-26, 434.
 
 
 15
 On appeal, this court found that the district court, having dismissed the federal claims, failed to "expressly exercise its discretion to maintain or decline jurisdiction over the pendant claims under 28 U.S.C. § 1367." Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc., 84 F.3d 1452 (D.C.Cir.1996) (unpublished table decision), 1996 WL 250412, at * 1. We remanded to the district court for further proceedings.
 
 
 16
 Exercising its discretion, the district court again dismissed Armstrong's claims as to all defendants except ACCET (which subsequently settled with Armstrong and is no longer involved in these proceedings). See Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc., 980 F.Supp. 53 (D.D.C.1997) ("Armstrong II"). The district court held that Armstrong had no claim under the District of Columbia CCPA because the choice of law clause made California law applicable. It rejected her argument that the so-called "public policy exception" in choice of law doctrine required D.C. courts to override the choice of law clause and to apply the District's more protective consumer protection statute instead. See id. at 59-60. As to Armstrong's mistake and illegality claims, the district court found that the school had not lost its GSLP eligibility until after she enrolled, and that at any rate federal Higher Education Act policy preempted state law defenses based on lack of school accreditation. See id. at 61-64.
 
 
 17
 Appealing again, Armstrong reasserts her state law claims, arguing: (1) that the Holder Rule notice should be implied into her loan contract; (2) that the school's loss of accreditation rendered it ineligible to participate in the GSLP program, making her loan unenforceable on grounds of mistake or illegality; and (3) that the district court should not have applied the choice of law clause because it conflicts with D.C. public policy enacted to protect District citizens. With respect to the last claim, Armstrong asks us alternatively to certify the choice of law question to the District of Columbia Court of Appeals. Our review is de novo. See Systems Council EM-3 v. AT&T Corp., 159 F.3d 1376, 1378 (D.C.Cir.1998).
 
 II
 
 18
 We begin with Armstrong's implied contract claim. Relying on the FTC Holder Rule, she argues that National Business School had a "referral relationship" or "affiliation" with FITCO, thus permitting her to treat subsequent lenders as "standing in the shoes" of the school and to assert the school's misconduct as a defense against loan repayment. As the government acknowledged at oral argument, had Armstrong signed her loan contract after the 1992 amendments to the Higher Education Act, at which point the Secretary incorporated the Holder Rule notice into the common promissory note, she might well have a claim. Armstrong's allegation that the school gave her a loan application preprinted with FITCO's name as the chosen lender would support a Holder Rule notice claim because the school "recommend[ed] that the applicants seek loans" from FITCO, and FITCO either supplied the preprinted forms itself or "kn[e]w that a loan applicant was referred by [the] school." Overview, FTC Rule at 2, 3.
 
 
 19
 Acknowledging that her pre-1992 loan agreement contained no Holder Rule notice, Armstrong argues that the FTC's Holder Rule nevertheless required the notice's inclusion and that the court should therefore enforce it as an implied contractual term. She relies on the common law principle that contracts incorporate the law in force at the time of the agreement. See United Van Lines, Inc. v. United States, 448 F.2d 1190, 1195 (D.C.Cir.1971) ("Because the regulation was in existence at the time [the party] entered on performance, it became, in effect, a part of the contract between the parties."); see also Ballarini v. Schlage Lock Co., 100 Cal.App.2d Supp. 859, 226 P.2d 771, 773-74 (1950) ("The settled law of the land at the time a contract is made becomes a part of it and must be read into it."). Appellees disagree. They argue that the FTC Holder Rule did not apply to student loans made in 1988 and that even if it did, its terms cannot be implied into Armstrong's agreement.
 
 
 20
 We think appellees have the better of this argument. Although the Truth in Lending Act, the source of the Holder Rule, originally covered GSLP lending, Congress expressly exempted student loans from the Act in 1982. At that point the FTC stopped enforcing the Holder Rule with respect to GSLP loans. Not until after Armstrong obtained her loan from FITCO did the FTC again begin enforcing the Holder Rule in GSLP loans, and not until after that did the Secretary incorporate the notice into the common promissory note. See supra at 1364-65. Facing circumstances very much like those presented in this case, the Seventh Circuit, relying on the 1982 TILA Amendments, expressly held the Holder Rule inapplicable to guaranteed student loans obtained prior to renewal of Holder Rule enforcement. See Veal v. First Am. Sav. Bank, 914 F.2d 909, 914 (7th Cir.1990).
 
 
 21
 To be sure, both the FTC and the Secretary have since suggested that the Holder Rule did in fact apply to guaranteed student loans during the period when Armstrong obtained her loan. See FTC Opinion at 2-3 (rejecting its previous "literal interpretation" exempting GSLP loans from the Holder Rule and claiming that Congress did not mean to exclude such loans from the Rule's coverage when it exempted them from TILA); Overview, FTC Rule at 1 (concluding that "the FTC Holder Rule notice must be included in the common application/promissory note."). In our view, however, these later developments are insufficient to overcome the clear implications of the 1982 TILA Amendments and the FTC's nonenforcement policy. Moreover, even if there were some ambiguity as to the Holder Rule's applicability to student loans during the late 1980s, we would not imply the terms of the notice into Armstrong's loan for one simple reason: No one could reasonably argue that in 1988 appellees, the purchasers and assignees of Armstrong's note (which contained no Holder Rule notice), should have known that the Holder Rule nevertheless applied to GSLP loans at that time. Lenders still operated under a federal program that encouraged them to make loans for attendance at virtually any accredited school, no matter how deficient or disreputable. While Congress and the Department have since changed the rules, we think it would be unfair to apply the new rules to old loans.
 
 
 22
 Relying on contract-based theories of mistake and illegality, Armstrong next claims that her loan is void and unenforceable because National Business School had lost its accreditation in 1987 and was therefore not an institution "eligible" for participation in the federal student loan program. See 20 U.S.C. § 1085(a), (c) (1988). The district court rejected this claim, holding that schools do not lose their GSLP eligibility until after a hearing before an administrative law judge; in this case the hearing did not occur until 1989, a year after Armstrong received her loan. Armstrong now argues that the district court mistakenly relied on regulatory instead of statutory eligibility rules. She points out that under statutory rules, "the effective date of a loss of eligibility by reason of the failure of an institution, its location, or its program to satisfy the applicable definitions continues to be the date on which the failure first occurred." 55 Fed.Reg. 32,181 (1990) (Secretary's explanation of the effects of failure to meet statutory requirements). We need not resolve this dispute to decide this case, for regardless of when National Business School lost its GSLP eligibility, we agree with the Secretary that federal student loan policy preempts Armstrong's claims.
 
 
 23
 Federal preemption can be express or implied. See Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Nothing in the Higher Education Act expressly preempts state law claims of the kind raised by Armstrong. Implied preemption occurs either "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation" (known as field preemption) or "in those areas where Congress has not completely displaced state regulation, ... to the extent [state law] actually conflicts with federal law" (known as conflict preemption). California Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 281, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987) (internal quotation omitted). In Jackson v. Culinary School, we held that federal education policy regarding GSLP lending is not so extensive as to occupy the field. See Jackson v. Culinary Sch., 27 F.3d 573, 580-81 (D.C.Cir.1994), vacated on other grounds, 515 U.S. 1139, 115 S.Ct. 2573, 132 L.Ed.2d 824, on reconsideration, 59 F.3d 254 (D.C.Cir.1995). Jackson also recognized that the Higher Education Act preempts D.C. laws that "actually conflict" with federal law. Id. at 581 (stating but declining to reach the conflict preemption issue). Although Jackson was later vacated on other grounds, we believe that it correctly stated and applied federal preemption standards.
 
 
 24
 "Actual conflict" between Armstrong's contract claims and Higher Education Act regulations is precisely what has occurred here. If accepted, Armstrong's claim that she may void her student loan based on the school's alleged GSLP ineligibility would frustrate specific federal policies regarding the consequences of losing or falsely certifying accreditation. For example, it is the Secretary and guaranty agencies--not students--who enforce statutory and regulatory requirements, including those concerning accreditation and school misrepresentation. See 20 U.S.C. § 1094(c) (1988); 34 C.F.R. §§ 668.71-.75, 682.700-.710 (1988). Reinforcing this point, the preamble to the final rule regarding institutional eligibility says this:
 
 
 25
 [The Department] considers the loss of institutional eligibility to affect directly only the liability of the institution for Federal subsidies and reinsurance paid on those loans.... [T]he borrower retains all the rights with respect to loan repayment that are contained in the terms of the loan agreements, and [the Department] does not suggest that these loans, whether held by the institution or the lender, are legally unenforceable merely because they were made after the effective date of the loss of institutional eligibility.
 
 
 26
 58 Fed.Reg. 13,337 (1993). Moreover, the Department expressly permits lenders to rely in good faith on eligibility representations by students and schools so long as the schools did not "originate" the loans. See 34 C.F.R. § 682.206(a)(2) (1988). Allowing mistake and illegality claims based on GSLP eligibility requirements to void student loan repayment obligations would "stand[ ] 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " Guerra, 479 U.S. at 281, 107 S.Ct. 683 (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).
 
 
 27
 This brings us finally to Armstrong's claim under the District of Columbia Consumer Credit Protection Act. She relies on section 28-3809, which provides:
 
 
 28
 (a) A lender who makes a direct installment loan for the purpose of enabling a consumer to purchase goods or services is subject to all claims and defenses of the consumer against the seller arising out of the purchase of the goods or service if such lender acts at the express request of the seller, and(1) the seller participates in the preparation of the loan instruments....
 
 
 29
 D.C.CODE ANN. § 28-3809 (1981). Characterizing her guaranteed student loan as a "direct installment loan," Armstrong argues that National Business School's marketing of FITCO loans through preprinted application forms, along with its assistance in filling out loan applications, brings her loan within the CCPA's protection. According to appellees, the district court properly dismissed Armstrong's CCPA claim on the ground that the promissory note's choice of law clause made California law applicable. See Armstrong II, 980 F.Supp. at 58-60.
 
 
 30
 We need not determine whether D.C. courts would set aside the choice of law clause as contrary to D.C. public policy or whether, alternatively, to certify this question to the D.C. Court of Appeals, because we again agree with the Secretary that Armstrong's state law cause of action conflicts with pre-1992 federal policy governing guaranteed student loans. As we have noted, pre-1992 federal student loan policy was intended to make student loans attractive to private lenders by protecting them from the financial consequences of student default. Although the Department's school-origination policy certainly allows students to raise school misconduct defenses in limited circumstances, the Department expressly warned that the policy was "not intended to create any other rights for student borrowers or to suggest that borrowers are excused from repaying loans" except where there is a school-origination relationship. 58 Fed.Reg. 13,337 (1993). Allowing student borrowers to raise CCPA defenses based on school misconduct against lenders who do no more than permit schools to "participate[ ] in the preparation of the loan instruments" at the schools' "request," D.C.CODE ANN.s 28-3809(a), would extend lender liability beyond school-origination relationships. In letter rulings discussing circumstances closely mirroring the facts of this case, the Secretary assured lenders that they do not risk falling within the scope of the school-origination policy merely by "market[ing] GSL lending by sending combined application/promissory note/disclosure forms ... with the lender's name preprinted thereon, directly to the school," and allowing schools to assist students in completing loan applications on those forms. Letter from John E. Dean, Clohan & Dean, to Larry Oxendine, Director, Division of Policy and Program Development, U.S. Dep't of Educ. (Dec. 14, 1990); Letter from Larry Oxendine to John E. Dean (Feb. 20, 1991). Permitting Armstrong to raise CCPA defenses against repayment of her pre-1992, pre-common promissory note loan would subject appellees to risks neither anticipated by them nor intended by the Guaranteed Student Loan Program.
 
 
 31
 Nothing in United States v. Griffin, 707 F.2d 1477 (D.C.Cir.1983), requires a different result. There, we found no preemption of state law defenses by a different student loan program under which the federal government insures GSLP loans made directly by schools. Because under that program the student borrowed directly from the school, the Department's school-origination policy squarely applied, and the asserted state law claims did not expand lender risk beyond that contemplated by federal policy. Moreover, allowing students to raise school misconduct defenses against the federal government could have had no impact on the private lending that Congress considered so critical to the operation of the pre-1992 Guaranteed Student Loan Program.
 
 III
 
 32
 We acknowledge that denying relief to Armstrong may seem unfair. Lenders that permitted schools to abuse the Guaranteed Student Loan Program and that profited enormously prior to the 1992 changes are protected by federal preemption. Owners of schools that profited from student loans while failing to provide promised training and resources are protected by bankruptcy laws. Only the students, the very people the Guaranteed Student Loan Program was intended to benefit, are left holding the bag.
 
 
 33
 The 1992 changes in the federal student loan program went a long way toward eliminating this unfairness for students who borrowed after 1992. The Secretary has even established loan discharge procedures for two categories of pre-1992 borrowers: those whose for-profit schools closed while they were in attendance, and those whose own GSLP eligibility (not the school's eligibility) was falsely certified. See 34 C.F.R. § 682.402(d), (e) (1997). These procedures provide no relief for students like Armstrong, whose schools falsely represented their accreditation or engaged in other misconduct. We have no authority to protect such students, but we think the Secretary does. See 20 U.S.C.A. §§ 1082(a), 1087-0 (Supp.1998).
 
 
 34
 So ordered.
 
 
 35
 KAREN LECRAFT HENDERSON, Circuit Judge, concurring:
 
 
 36
 I concur in the result but neither agree with nor deem appropriate the concluding two paragraphs of the opinion. The student loan program may have its flaws but there is no basis to wring our hands over this one, especially when defaulting student loan borrowers constitute a significant national problem in the administration of the program.
 
 
 
 *
 The Guaranteed Student Loan Program has since been renamed the Federal Family Education Loan Program. See Higher Education Act Amendments of 1992, Pub.L. No. 102-325, sec. 411(a)(1), § 1071, 106 Stat. 448, 510. Throughout this opinion, we refer to the program as the GSLP, its name at the time appellant borrowed in 1988; where relevant, we cite law in effect in 1988