FARMINGTON RIVER POWER COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

No. 95–1504.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 9, 1996.

Decided Jan. 10, 1997.

---

John N. Estes, III, Washington, DC, argued the cause and filed the briefs for petitioner.

Janet K. Jones, Attorney, Federal Energy Regulatory Commission, Silver Springs, MD, argued the cause for respondent. With her on the brief was Jerome M. Feit, Solicitor, Washington, DC.

Before: GINSBURG, RANDOLPH and TATEL, Circuit Judges.

Opinion of the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

The basic issue in this case is whether the Federal Energy Regulatory Commission may charge petitioner, an operator of a nonli-

censed dam, for what are known as "headwater benefits"—energy benefits a dam receives from the operation of an upstream dam—for periods prior to the date on which the Commission notified petitioner of its potential liability. Because we hold that section 10(f) of the Federal Power Act authorizes FERC to impose headwater charges only for periods following individual notice, we vacate the Commission's Order and remand for reconsideration. We also conclude that the Commission, in violation of section 27 of the Power Act, improperly charged petitioner for releases of water to which petitioner had a vested right under state law.

## I

This case involves three dams on the Farmington River, a tributary of the Connecticut River flowing from Massachusetts through the New Hartford, Connecticut area. Owned by petitioner, the Farmington River Power Company, and built in 1925 near the river's mouth, Rainbow Dam supplies power to Farmington's parent company, the Stanley Works. Because Rainbow Dam is not on a navigable waterway, it did not originally need a license from the Federal Power Commission, FERC's predecessor. In 1972, the Second Circuit reversed FERC's attempt to bring the dam under license, concluding that requiring a license for a dam that predated the licensing requirement would exceed FERC's authority. *Farmington River Power Co. v. FPC*, 455 F.2d 86 (2d Cir.1972).

The Metropolitan District, a Connecticut municipal corporation, owns Goodwin Dam, which was completed in 1960 and is located about forty-five miles upstream from Rainbow Dam. The Army Corps of Engineers constructed the third dam, Colebrook, in the pool of water Goodwin Dam created. Colebrook Dam began operating in 1969. The Metropolitan District now operates Colebrook in conjunction with Goodwin Dam.

Hydropower plants benefit from even and predictable flows of water, which allow them to operate continuously at higher capacity. Through storage and controlled release of water, upstream dams and reservoirs create such "headwater benefits." To encourage the construction of these flow-control dams,

Congress included section 10(f) in the Federal Water Power Act of 1920, requiring licensed power projects receiving headwater benefits to pay to the upstream providers equitable charges as determined by the Federal Power Commission. Federal Water Power Act, ch. 285, sec. 10(f), 41 Stat. 1063, 1070 (1920). In 1935, Congress amended the Act to authorize the Commission to assess nonlicensed dams for headwater benefits. Federal Power Act, ch. 687, tit. II, § 206, 49 Stat. 803, 843–44 (1935) (codified as amended at 16 U.S.C. 803(f) (1994)).

Almost two decades after the construction of Colebrook Dam, FERC informed Farmington, by letter dated January 11, 1988, that it was "conducting a headwater benefits study of the Farmington River Basin under section 10(f) of the Federal Power Act" and requested information about flow and power generation for the period from 1975 to 1986. Farmington supplied the requested information. After conducting a study using a complex computer model, FERC issued a preliminary report in December 1991, estimating headwater benefits to Farmington between 1972 and 1991 at $682,667. Following a period for comment and discussion, the Commission issued a final report in September 1994, along with an order assessing Farmington $943,835, including $68,759 for the cost of conducting the headwater benefits study. *Farmington River Power Co.*, 68 FERC ¶ 62,291, 1994 WL 528394 (1994).

Farmington sought rehearing, claiming that it had no notice of charges prior to the study, and that it had a vested right to the release of the water in question. The Commission denied rehearing on both grounds, but granted rehearing as to Farmington's argument that the statute did not authorize charging nonlicensees for the costs of the study, and vacated that portion of its initial Order. *Farmington River Power Co.*, 72 FERC ¶ 61,119, 1995 WL 454375 (1995).

## II

■ We begin with the basic issue in this case: whether section 10(f) charges may include assessments for headwater benefits received prior to the notice called for by this

section. With respect to nonlicensed dams, section 10(f) provides:

> Whenever any power project not under license is benefited by the construction work of a licensee or permittee, the United States or any agency thereof, the Commission, after notice to the owner or owners of such unlicensed project, shall determine and fix a reasonable and equitable annual charge to be paid to the licensee or permittee on account of such benefits, or to the United States if it be the owner of such headwater improvements.

16 U.S.C. § 803(f) (1994). Relying on section 10(f)'s initial phrase, the Commission argues that liability attaches "whenever" power projects receive benefits, whether before or after notice from FERC. We disagree. Because the "whenever" phrase modifies only the verbs "shall determine and fix," it specifies only when the Commission may determine and fix charges, not the period of liability. Only "equitable" and "annual" directly modify the word "charge." Because requiring that charges be annual has no significance for charges based on periods prior to notice, the word "annual" creates a presumption of prospective charges.

▆ The signal difference between this language concerning nonlicensed dams and the language covering licensees reinforces our reading of the statute. As to licensed dams, the first paragraph of section 10(f) specifies that "the Commission shall require as a condition of the license that the licensee so benefited shall reimburse" the owner of an upstream dam for headwater benefits. *Id.* Licensed dams, then, have an affirmative duty to pay. The statute itself, as well as the explicit conditions of their licenses, puts licensed dams on clear notice of this duty. In contrast, nonlicensed dams have neither an affirmative duty to pay nor licenses providing individual notice of the date from which liability may accrue. Instead, section 10(f) directs FERC to fix an annual charge "after notice." *Id.* Because Congress thus clearly contemplated only prospective annual charges, we need not defer to the Commission's contrary interpretation. *See MCI Telecomm. Corp. v. AT&T,* 512 U.S. 218, ——, 114 S.Ct. 2223, 2231, 129 L.Ed.2d 182 (1994)

("[A]n agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear."); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter.").

▆ Even if we thought the language of the statute ambiguous, we would not defer to the Commission, because we find its interpretation of section 10(f) unreasonable. *See id.* at 843–44, 104 S.Ct. at 2781–83. As interpreted by the Commission, nothing in section 10(f) would prohibit it from imposing retroactive liability all the way back to 1935, the year in which Congress amended section 10(f) to cover nonlicensed dams. Although the Commission limits retroactive liability to 25 years, *Louisville Gas & Elec. Co.,* 58 FERC ¶ 61,338, ¶ 62,094, 1992 WL 74702 (1992), it does so simply as an exercise of its equitable discretion, not because it believes the statute so requires.

The Commission's interpretation of section 10(f) is particularly unreasonable in view of the peculiar nature of headwater benefits liability. Unlike in most regulatory statutes, where liability accrues from the actions of regulated parties, here liability flows solely from the actions of others, i.e., operators of upstream dams. As the Commission acknowledges, it is difficult for a project owner even to know whether its dam is receiving headwater benefits. Under these circumstances, we cannot believe Congress meant to impose pre-notice liability on owners of nonlicensed dams such as Farmington.

▆ Our holding that the Commission may not impose pre-notice liability raises a related question: What action by the Commission constitutes the notice after which it may impose headwater benefits liability? In this case, there are three possibilities: the Commission's initial notification of Farmington in January 1988 that it was beginning a headwater benefits study; the Commission's issuance of its preliminary assessment in December 1991; and the Commission's release of its final report in September 1994. Although Farmington suggests that the critical event for purposes of notice was the issuance of the

preliminary assessment in December 1991, the Commission understandably has not taken a position on this issue—after all, it has argued that it may extend liability back to 1972. Because selection of the proper date for the beginning of liability involves questions both of statutory interpretation and of agency policy, we think it best to allow the Commission to formulate its view about this issue on remand.

### III

■ We turn next to Farmington's argument that, in violation of section 27 of the Power Act, the Commission has assessed it for water to which it had a vested right under state law. Section 27 provides: "Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein." 16 U.S.C. § 821 (1994).

Beginning in 1911, in a series of agreements with the Metropolitan District and its predecessor, the Board of Water Commissioners of the City of Hartford, Farmington acquired rights to a regulated flow of water. Farmington acquired these rights to offset certain diversions of water in various tributaries of the Farmington River. In 1949, the Connecticut legislature passed Special Act No. 444, authorizing the Metropolitan District to construct Goodwin Dam. An Act Increasing the Powers of the Metropolitan District, Respecting Water, 1949 Conn. Spec. Acts 1013. Special Act No. 444 specifically authorized the District, using water in excess of amounts needed to supply the local water system, to regulate the river's flow in order to compensate riparian owners for the dam's diversion of water. *Id.* § 3. The Special Act also required a minimum flow of 50 cubic feet per second. *Id.* § 4. In 1961, the Metropolitan District and the riparian owners, including Farmington, executed a Riparian Agreement which reaffirmed the 50-cubic-feet-per-second minimum, and instituted a yearly minimum flow of 21.7 billion gallons. The Agreement expressly required the District to continue these releases even if the District and the United States were to construct an upstream dam.

In 1963, Connecticut authorized the District to contract with the federal government to share in the benefits and costs of Colebrook Dam. The authorizing act expressly provided, "The powers granted by this act shall not affect ... the obligation of the said district to maintain at all times ... a minimum flow ... as provided in [Special Act No. 444]." An Act Amending the Charter of the Metropolitan District, Concerning the Colebrook River Dam, 1963 Conn. Spec. Acts 98. In 1965, the District and the United States entered into the Colebrook Agreement, which granted the District permanent rights to certain water releases from Colebrook Dam.

Farmington claims that Special Act No. 444 and the 1961 Riparian Agreement create vested rights under state law that section 27 of the Power Act prohibits FERC from derogating. According to the Commission, whatever rights Farmington may have in water from Goodwin Dam, it has no right to water from Colebrook Dam. The Commission's argument misses the point. The question is not whether Farmington has rights to water from Colebrook Dam, but whether it has vested rights in water from Goodwin. We think it clearly does. Under the Special Act and the Riparian Agreement, Farmington has vested rights to 21.7 billion gallons of water per year, and to a certain amount of control over the release of that water, free of charge. The Commission's effort to charge Farmington for water covered in Special Act No. 444 and the Riparian Agreement thus interferes with Farmington's vested rights. Because the District had no authority to enter into an agreement with the federal government that would impair Farmington's rights under Special Act No. 444, the government's construction of Colebrook Dam cannot negate Farmington's vested rights.

The Commission claims that its headwater benefits study did in fact take account of Farmington's preexisting rights, but we have reviewed the Commission's study ourselves and can find no indication that this is so. At oral argument, we asked Commission counsel

to point to any statement in the study showing that the Commission took Farmington's rights into account or that the assessment of benefits from Colebrook Dam specifically excluded the benefits derived from Goodwin Dam. Unable to identify any such reference, counsel nevertheless assured us that it was "absolutely safe to assume" that benefits from Goodwin were excluded. Yet the record is to the contrary. The only references to Goodwin Dam in the Commission's entire final report treat it as part of Colebrook's reservoir system. Moreover, the Commission's only response in the final report to Farmington's assertion of preexisting rights was a denial of the existence of *any* such rights:

> Water flows through the Farmington River Basin are subject to flowage rights and water storage agreements among numerous riparian owners.... Farmington maintains that many of these releases should be considered in the headwater benefits determination and excluded from the energy gains calculations.... The Commission's staff evaluation was conducted based on section 10(f) of the Federal Power Act which creates a statutory liability to reimburse the United States for headwater benefits received. *No other contractual or other right to the continued enjoyment of this benefit arises by virtue of this statutory obligation.*

Division of Project Compliance & Admin., Fed. Energy Regulatory Comm'n, Final Report: Headwater Benefits Determination: Farmington River Basin 31 (1994) (emphasis added). We conclude that in assessing Farmington for the release of water covered by Special Act No. 444 and the 1961 Riparian Agreement, the Commission has violated section 27 of the Federal Power Act.

Finding the Commission's Order on Rehearing in error on both the liability period and the liability amount, we vacate and remand for further proceedings consistent with this opinion.

*So ordered.*