# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 12, 2008     Decided November 28, 2008

No. 07-1162

ALBANY ENGINEERING CORPORATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

HUDSON RIVER-BLACK RIVER REGULATING DISTRICT,
INTERVENOR

———

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

———

*William S. Huang* argued the cause for petitioner. With him on the briefs were *Frances E. Francis* and *Rebecca Baldwin*.

*Lona T. Perry*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief were *Cynthia A. Marlette*, General Counsel, *Robert H. Solomon*, Solicitor, and *Judith A. Albert*, Senior Attorney.

*Michael N. McCarty* argued the cause for intervenor. With him on the brief were *John H. Conway* and *Christian D. McMurray*.

Before: BROWN and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Concurring opinion filed by *Circuit Judge* BROWN.

WILLIAMS, *Senior Circuit Judge*: An upstream dam typically will render the downstream flow more even and predictable, enabling downstream hydropower plants to operate at a higher capacity. *Farmington River Power Co. v. FERC*, 103 F.3d 1002, 1004 (D.C. Cir. 1997); see also 18 C.F.R. § 11.10(a)(2). To enable the upstream firms to recoup part of the cost of conferring these "headwater benefits," Congress in § 10(f) of the Federal Power Act ("FPA"), 16 U.S.C. § 803(f) (2006), directed the Federal Energy Regulatory Commission (technically the direction was to its predecessor, but the change is of no moment here) to require its downstream licensees to reimburse upstream operators "for such part of the annual charges for *interest, maintenance, and depreciation* thereon as the Commission may deem *equitable*." *Id*. (emphases added). This case presents the question whether § 10(f) preempts state law over compensation for headwater benefits, or whether, alternatively, it allows states to mandate compensation for elements of cost other than "interest, maintenance, and depreciation."

FERC held that § 10(f) preempted state law *only* insofar as the state authorized charges for interest, maintenance, and depreciation. *Fourth Branch Associates (Mechanicville) v.*

*Hudson River-Black River Regulating District*, 117 FERC ¶61,321 (2006) ("*Order*").  Thus it left New York (the state in question, and of course by extension all other states) free to authorize upstream firms to assess FERC licensees for all headwater improvement costs not fitting into the "interest, maintenance, and depreciation" categories.

Our review of the text and legislative history of the FPA generally and § 10(f) specifically convinces us that § 10(f) must, in order to accomplish the full objectives of Congress, be understood to preempt all state orders of assessment for headwater benefits.  See *Louisiana Pub. Serv. Comm'n v. F.C.C.,* 476 U.S. 355, 368-69 (1986) ("Pre-emption occurs . . . where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress."); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000);  *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 881 (2000); *Armstrong v. Accrediting Council for Continuing Educ. and Training, Inc.,* 168 F.3d 1362, 1369 (D.C. Cir. 1999).  Thus we find that FERC's interpretation of § 10(f) was unreasonable, and we remand the case to FERC to consider appropriate remedies consistent with our holding.

\* \* \*

The Hudson River-Black River Regulating District (the "District") is a New York state agency authorized to operate the Conklingville Dam and its related impoundment, Great Sacandaga Lake, on the Sacandaga River, a tributary of the Hudson.  *Fourth Branch Associates (Mechanicville) v. Hudson River-Black River Regulating District*, 119 FERC ¶61,141, PP 3–10 (2007) ("*Order on Rehearing*").  In 1992, FERC determined that the District must obtain licenses for both the Conklingville Dam and Great Sacandaga Lake

because the E.J. West Project, a FERC licensee located on the Conklingville Dam, used the District's facilities to generate power. FERC issued an original license to the District in September 2002. *Id*.

Albany Engineering Corporation is the successor to Fourth Branch Associates and as such is the FERC licensee for the Mechanicville Hydroelectric Project, located downstream of Great Sacandaga Lake. *Id*. New York law authorizes the District to recover its capital, maintenance, and *operating* costs through assessments against public corporations and real estate parcels benefited by the construction of dams and reservoirs. N.Y. Envtl. Conserv. Law § 15-2121. Under this authority the District has been levying annual assessments against downstream FERC licensees such as Albany for decades. *Order*, 117 FERC ¶61,321 at P 11.

On July 25, 2006, Albany filed a formal complaint with FERC against the District, alleging that since 2002 the District had been improperly assessing annual charges for headwater benefits. *Id.* at P 1. Albany argued that § 10(f) vests FERC with the exclusive jurisdiction to determine the level of reimbursement for costs associated with such benefits. Section 10(f) states:

> That whenever any licensee hereunder is directly benefited by the construction work of another licensee, a permittee, or of the United States of a storage reservoir or other headwater improvement, the Commission shall require as a condition of the license that the licensee so benefited shall reimburse the owner of such reservoir or other improvements for such part of the annual charges for *interest, maintenance, and depreciation* thereon as the Commission may deem *equitable*. The proportion of such charges to be paid by any licensee shall be

determined by the Commission. The licensees or permittees affected shall pay to the United States the cost of making such determination as fixed by the Commission.

16 U.S.C. § 803(f) (emphases added).

FERC found that "there is no question" that the District had charged Albany for headwater benefits. *Order*, 117 FERC ¶61,321 at P 38. Insofar as New York's statutory scheme covered charges for interest, maintenance, and depreciation, it found the scheme preempted by § 10(f). *Id*. at P 44. So far as other costs were concerned, however, FERC rejected Albany's preemption claim. *Id*. at PP 49-50. In reaching this conclusion, it characterized § 10(f) as manifesting a single federal interest—that of "ensuring the participation of downstream project owners in the financial burden incident to the construction of power and storage facilities of a river basin." *Id*. at P 49. FERC also found that it had no authority to require the District to rescind assessments made under color of state law or to order refunds of amounts already paid. *Id*. at PP 55–56.

Albany sought rehearing, which FERC denied. Albany now appeals to this court, objecting to all the above rulings other than FERC's finding that § 10(f) *did* preempt state-law mandates for reimbursement of interest, maintenance, and depreciation. (The District files no cross appeal on that issue.)

* * *

This court generally reviews an agency's interpretations of the statutes it administers under the deferential standard set forth in *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984). But a recent dissenting Supreme Court opinion has called into question whether *Chevron* deference is appropriate when

addressing questions of preemption. In *Watters v. Wachovia Bank*, 127 S. Ct. 1559, 1584 (2007) (Stevens, J., dissenting) (joined by Roberts, C.J., and Scalia, J.), the dissent argued that "[u]nlike Congress, administrative agencies are clearly not designed to represent the interests of the States . . . ." As a result, the dissent reasoned that "when an agency purports to decide the scope of federal preemption, a healthy respect for state sovereignty calls for something less than *Chevron* deference." *Id.*

We have in the past rejected the argument that "wherever a federal agency's exercise of authority will preempt state power, *Chevron* deference is inappropriate." *Oklahoma Natural Gas Co. v. FERC*, 28 F.3d 1281, 1284 (D.C. Cir. 1994). We reasoned that, "with the exception of negative exercises of federal authority, all agency legal interpretations have some preemptive effect . . . ." *Id.* Hence, we rejected the application of a "non-deference principle" because it would "have to be applied almost universally, overturning *Chevron*." *Id.* The context, to be sure, involved an issue—the scope of the agency's jurisdiction—that only implicitly was of preemptive effect, not, as here, an express issue of whether undisputed FERC authority has preemptive effect. *Oklahoma Natural Gas Company* also of course left open the question of whether or not an agency decision that *avoids* preemption of a state law—as is the case with FERC's decision here—is still deserving of *Chevron* deference.

Ultimately, this case doesn't require us to resolve the applicability of *Chevron* to agency preemption decisions, as "we would vacate [FERC's] interpretation even under the more deferential *Chevron* standard." *Port Authority of New York and New Jersey v. Dep't of Transp.*, 479 F.3d 21, 28 (D.C. Cir. 2007). In short, we will assume in favor of FERC that its conclusion is entitled to *Chevron* deference.

Another framing issue is the familiar presumption against preemption. See, e.g., *Geier v. American Honda Motor Co., Inc.*, 166 F.3d 1236, 1237 (D.C. Cir. 1999), *aff'd,* 529 U.S. 861 (2000). But this presumption may be overcome if, as we hold today, the court finds that the preemptive purpose of Congress was "clear and manifest." *Geier*, 166 F.3d at 1237 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

\* \* \*

We start with FERC counsel's concession at oral argument that under § 10(f) FERC itself could not impose charges for headwater benefits other than "interest, maintenance, and depreciation." Oral Argument Rec. 15:10–15:27. The concession was surely inevitable. As the certainty of other costs was as plain as plain could be, Congress's express provision for three types could hardly leave room for a FERC mandate of reimbursement of, say, the operational costs in dispute here. The maxim *expressio unius est exclusio alterius* has its limits, but we need not plumb them here.

FERC's position, then, must be that although Congress would not allow *it* to mandate collection of other types of costs, it meant to allow the states to do so freely. Neither the overall function of the FPA, nor the sense of § 10(f), allows us to infer such a meaning.

The Supreme Court has extensively analyzed the "circumstances which culminated in the passage of the Federal Water Power Act in 1920." *First Iowa Hydro-Elec. Coop. v. Fed. Power Comm'n*, 328 U.S. 152, 180 (1946). It found that the Act was "the outgrowth of a widely supported effort of the conservationists to secure enactment of a *complete scheme of national regulation* which would promote the *comprehensive* development of the water resources of the

Nation." *Id.* (emphases added). Congress's intent was "not merely to prevent obstructions to navigation," but rather to "secure enactment of a comprehensive development of national resources" through control over the "engineering, economic and financial soundness" of hydropower projects. *Id*. at 172, 180–81. It proceeded to find Iowa's licensing scheme preempted:

> A dual final authority, with a duplicate system of state permits and federal licenses required for each project, would be unworkable. Compliance with the requirements of such a duplicated system of licensing would be nearly as bad.

*Id*. at 168 (internal quotations omitted). Given the commitment to comprehensive federal regulation, and preclusion of dual licensing authority, it is hard to imagine why Congress would have countenanced disparate state reimbursement schemes, calculated on different bases and potentially imposing severe costs on hydropower firms in *other* states, downstream of the enacting jurisdiction. This seems like precisely the sort of heterogeneity and conflict that a complete and comprehensive scheme would be expected to prevent.

Of course this does not mean that the FPA precludes every state exercise of power marginally related to federal hydropower licensees. *California v. FERC*, 495 U.S. 490, 496–97 (1990). Thus, we must still examine the specific language and legislative history of § 10(f) to determine if there is "clear evidence" that Congress intended to preempt headwater benefits charges for costs not covered by § 10(f). *Id*.

As we mentioned earlier, FERC discerned from the text and legislative history of § 10(f) a single "federal interest,"

namely the interest in "ensuring the participation of downstream project owners in the financial burden incident to the construction of power and storage facilities of a river basin." *Order*, 117 FERC ¶61, 321 at P 49. If that federal interest were the only one, it would make sense to understand § 10(f) as leaving states free to load up the downstream operators with costs outside the three specified categories.

But if assuring such a contribution to upstream owners' burdens had been Congress's *sole* intent, it is hard to see why Congress would have limited FERC's *own* authority to "interest, maintenance, and depreciation," as FERC's own concession and the sound application of *expressio unius* make clear it did. FERC advances no argument for why FERC would be less well suited than the states to determine equitable operating expenses, as opposed to interest, maintenance, and depreciation charges. Nor does FERC offer any reason Congress would be concerned that FERC set only charges it deemed *equitable*, yet would leave states free to collect charges regardless of whether they met FERC's judgment of their equity.

FERC's approach here manifests an interpretative error of long standing, one that apparently will never die: to treat a statute's primary or precipitating object as its sole object. As the Supreme Court said in *Rodriguez v. United States*, 480 U.S. 522, 526–27 (1987),

> But no legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.

*Id*. at 525–26 (emphasis in original). See also *Bd. of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 373–74 (1986); *Vencor, Inc. v. Physicians' Mut. Ins.*, 211 F.3d 1323, 1325–26 (D.C. Cir. 2000).

The text of § 10(f) clearly reflects just such congressional balancing. The limitation on the types of costs recoverable, and the insistence that such costs be deemed "equitable" by FERC, manifest a deliberate congressional decision to balance the goal of compensating upstream owners (and thus encouraging their investment) and that of protecting downstream ones (and thus encouraging their investment). FERC itself, in its own provision for reimbursement under § 10(f), invokes the word "equitable" to support its limitation of headwater benefits charges to "85 percent of the value of the energy gains." 18 C.F.R. § 11.11(b)(5). See also Order No. 453, 51 Fed. Reg. at 24,314, [1986-1990 Regs. Preambles] FERC Stat. & Regs. at 30,310 (addressing issue of whether the cap provided downstream operators with adequate incentives); 49 Fed. Reg. 1067-01, 1070 [1982-1987 Proposed Regs.] FERC Stat. & Regs. at 32,850 (explaining that the purpose of a cap on total charges was to avoid the "inequitable result" of charges "larger than the value of the gains for a project for an individual year").

The legislative history of § 10(f) is consistent with this interpretation. Several representatives speaking in support of § 10(f) stressed that § 10(f) was meant to provide for limited reimbursement. Representative Dill, speaking in favor of the § 10(f) amendment, explained:

> Take the Columbia River power sites and the power sites
> on the streams that flow into it. If a dam is built to
> establish a reservoir for water to furnish power on one of
> these streams, it furnishes water for all dams below it and
> whoever may happen to build a dam on a power site

below should contribute to the cost of the reservoir dam *in proportion to the benefits received*. This amendment provides that very thing, and I most earnestly hope it will be adopted.

56 Cong. Rec. 9,916 (1918) (emphases added). Representative Raker, also speaking in support of the amendment, stated that § 10(f) would require downstream licensees to contribute to the cost of an upstream project "to the expense [sic; "extent"?] that the subsequent works are benefited by virtue of the original work." *Id*.

FERC's reasoning in its orders here observed none of these signs of careful congressional balancing. Rather, the Commission simply stated that "the legislative history of section 10(f) is sparse and does not otherwise reveal Congress's reasons for limiting reimbursable costs to interest, maintenance and depreciation." *Order*, 117 FERC ¶61,321 at P 45. Consequently, FERC could see no reason to prevent the District from collecting for charges other than interest, maintenance, and depreciation, since preventing that collection would, it thought, be "disruptive" to the District's current assessment scheme. *Id*. at P 50. FERC emphasized that the District "has expenses that do not fall within the categories specified by section 10(f)," and if it were unable to assess such costs the District would have difficulty "administering a storage project that affects a variety of downstream uses within that state." *Id*.

FERC evidently believes that the legislative history's failure to mention "disruption" of the sort it espies here renders its interpretation of § 10(f) reasonable. But it is simply "not the law that a statute can have no effects which are not explicitly mentioned in its legislative history." *Pittston Coal Group v. Sebben*, 488 U.S. 105, 115 (1988). Moreover, "The relative importance to the State of its own

law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail." *Arizona v. Bowsher*, 935 F. 2d 332, 335 (D.C. Cir. 1991) (quoting *Fidelity Federal Savings & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 153 (1982)).

Though FERC found that the District was assessing charges for headwater benefits, *Order on Rehearing*, 119 FERC ¶61,141 at P 15, it repeatedly stressed the "unusual" nature of the "situation here, in which an upstream storage reservoir is owned by a state and is dependent on state-authorized assessments to cover its operations costs*," id.*. at P 41. See also *Order*, 117 FERC ¶61,321 at P 38; *Order on Rehearing*, 119 FERC ¶61,141 at P 32. But § 10(f) by its terms applies "whenever any licensee hereunder is directly benefited"—thus in *all* cases when licensees receive headwater benefits from the construction efforts of upstream licensees. The Commission's attempted distinction between public and private ownership is thus irrelevant to the question of whether or not § 10(f) preempts state laws mandating compensation for headwater benefits. If § 10(f) preempts state charges for headwater benefits, then it does so for both private and public actors equally.

Besides disrupting Congress's intended balance between provider and recipient interests, the Commission's understanding of § 10(f) would generate complex issues of meshing state charges with FERC-approved ones. FERC, in the absence of agreement between the parties, uses its Headwater Benefits Energy Gains model to allocate the interest, maintenance, and depreciation to downstream beneficiaries in proportion to the value of the energy gains each beneficiary enjoys, calculated as "the cost of obtaining an equivalent amount of electricity from the most likely alternative source," and of course subject to the cap of 85% of that value. 18 C.F.R. § 11.11(b)(5).

The District's methodology is rather different. Using a 1925 benefits study under which hydropower owners pay for 95% of the District's costs, it appears to apportion them among hydropower project owners on the basis of a mixture of private settlement agreements with E.J. West and a pro rata charge based on the amount of head at the individual downstream property as a percentage of the total head on the waterway. *Answer of Hudson River-Black River Regulating District to Compl. by Fourth Branch Associates (Mechanicville)*, 7–8 (filed Sept. 25, 2006); Joint Appendix ("J.A.") 258–59.

As FERC acknowledged, "There is no doubt that these differences between the assessment schemes exist." *Order on Rehearing*, 119 FERC ¶61,141 at P 33. Even in light of these differences, however, FERC argued that because the "New York scheme assesses charges for other expenses, based on a different method of determining benefits," the administration of both the New York law and § 10(f) would not be problematic. *Id*. at P 33.

But such a dual authority over headwater assessments, especially ones based on different methodologies, would result in a morass of issues that would undermine the congressional intent to create a comprehensive scheme of hydropower development. Two such issues are worth discussing here. First, FERC is quite naive in its assumption that because States would purportedly charge only for "other" costs (i.e., costs other than interest, maintenance, and depreciation) there could be no conflict with FERC authority. States could use different methods of accounting for costs, arbitrarily minimizing any characterization of costs as interest, maintenance, or depreciation. This would invite either duplicate collection from downstream owners or the creation of an accounting mess that some institution—FERC or a court—would have to sort out. This case illustrates precisely

such a problem. After FERC's initial Order was handed down, the District adopted a resolution to apply funds it received from Erie for the E.J. West Project against the District's full costs for interest, maintenance, and depreciation. *Resolution to Establish an Accounting Policy for the Application of E.J. West Water Fees*, J.A. 498–500. As a result, as the District sees it, all assessments to Albany are now for costs other than interest, maintenance and depreciation. *Id*. at 500. The resolution further provides that this change "shall have no financial or economic impact" on cost apportionment to Albany and others. *Id*. at 499. Thus, even though Albany currently pays the *exact same* amount as it did before this change in District policy, it will have to take on the expense of proving that the district's charges are at least in part "really" for interest, maintenance, and depreciation; given the potential elasticity of cost-accounting in such a context, the burden would likely be heavy—far beyond anything one can suppose Congress might have approved.

Second, even if the cost characterization issue could be easily resolved, FERC's interpretation of § 10(f) would allow states to apportion costs between downstream operators in a manner that results in charges far in excess of the actual benefits received (not to mention the 85% cap). Albany argues that this issue is present in this case as well. A District-commissioned report from 2003 concluded that the Mechanicville project receives only 0.11% of the benefits of the District's operations. J.A. 89 (Report of Gomez and Sullivan Engineers, P.C.). Yet, the District continues to assess Mechanicville at a rate of approximately 2.7% of the District's budget. J.A. 304–309 (Hudson River-Black River Regulating District Annual Assessments of Statutory Beneficiaries for the Fiscal Years 2003–2007, parcel 2 entries).

Regardless of whether one accepts the findings of the District-commissioned report, the point remains that FERC's holding would enable states to charge operators in excess of the benefits received, and thus necessarily in excess of FERC's 85% cap. Possibly FERC might respond creatively by reducing the "equitable" charge for interest, maintenance, and depreciation charges in response to state action. But there might well be instances where reduction to zero was not enough to hold the charge below 85% of FERC-computed benefits. Even where FERC could thus meet the statutory requirement that the charge be one deemed "equitable" by FERC, the exercise would entail costly dispute resolution.

Thus, FERC's holding would undermine Congress's clear intent to limit the total amount of charges imposed on downstream operators. Breach of that limit, combined with the cost-characterization issues (and perhaps others), leads to the conclusion that FERC's interpretation of § 10(f) would conflict with the FPA's purpose to provide for a comprehensive legislative scheme to govern the nation's hydropower development.

\* \* \*

We do not reach FERC's decision to neither order refunds for Albany's past payments to the District nor convene a settlement conference. FERC reasoned that § 10(f) does not grant it the "authority to address independent actions taken by an upstream licensee to collect charges under color of state law" absent a headwater benefits investigation. *Order on Rehearing*, 119 FERC ¶61,141 at P 55. And, though FERC plainly had authority to order a settlement conference, it reasoned that such a conference would be "more productive" in the context of a headwater benefits investigation. *Id*. at P 58.

Our holding that § 10(f) preempts *all* state headwater benefits assessments materially changes the context for FERC's consideration of both these issues. Whereas FERC and the District formerly believed that the District was free to assess charges for certain costs under the authority of state law, our holding makes clear that the District *never* had such authority to exact *any* compensation from Albany for headwater benefits. Albany's incentives to seek a headwater benefits investigation, the cost of which is shared among all parties, *id*. at P 58 n.34, are materially increased by our holding, since the District can no longer avoid or offset an adverse outcome by classifying costs as operational. Furthermore, FERC based its decision not to order a settlement conference in part on the District's opposition to such a proceeding. *Id.* at P 58. But just as Albany's incentives are changed by our preemption holding, so too are the District's, as it can no longer expect to recover its operating costs from Albany, with or without a headwater benefits investigation. In light of these changed circumstances, we find it appropriate to remand to FERC to consider the scope of its authority to craft appropriate remedies. See, e.g., 18 C.F.R. § 385.601 ("The Commission . . . may convene a conference of the participants in a proceeding at any time for any purpose related to the conduct or disposition of the proceeding"); FPA § 309, 16 U.S.C. § 825h ("The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter.").

Our separately concurring colleague argues that FERC "intended its remedies determination to be independent from its preemption determination," and as a result, "for purposes of judicial economy" we need not decide the scope of preemption. Concurring Op. at 1, 7. The concurrence bases

this conclusion on a topic sentence in FERC's order in which FERC stated that "even to the extent that it is preempted by section 10(f), we have no authority over the District's actions." *Order on Rehearing*, 119 FERC ¶61,141 at P 55. The very next sentence, however, illustrates that FERC could not have meant that it had literally *no* authority, as FERC goes on to detail what it might require the District to do. *Id.* The concurrence observes that FERC's claim that it has "no authority" would, if read literally, be "obviously ridiculous." Concurring Op. at 1.

Further, FERC asserted that §10(f) "does not give us authority to address independent actions taken by an upstream licensee to collect charges *under color of state law*, even if we determine that the law is, *in part*, preempted by the FPA." *Order on Rehearing*, 119 FERC ¶61,141 at P 55 (emphasis added). This language would seem to leave open the possibility that where charges may not be made *under color of state law,* because state law is in fact preempted *in its entirety,* § 10(f) may grant FERC some authority over the District's actions.

Even if our colleague is correct that on remand FERC may simply clarify that its holding on remedies was in fact meant to be independent, FERC's current reasoning on remedies explicitly references the District's actions under color of state law as at least a partial reason for FERC's finding that it has no remedial authority. Concerns over judicial economy do not dictate that we avoid FERC's preemption determination even if it later may find a different justification to deny relief, for "[i]f a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case—even though the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason." *Federal Election Commission v. Akins*, 524

U.S. 11, 23 (1998) (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)).  This analysis seems especially fitting here, where the incentives of the parties to seek a headwater benefits investigation—which the concurrence claims is the basis for reading FERC's remedies analysis as independent—are materially affected by FERC's misinterpretation of the FPA.

Before closing, a few points on cases the parties have invoked on FERC's power to order refunds:  First, FERC's reliance on *Transmission Agency of Northern California v. FERC*, 495 F.3d 663 (D.C. Cir. 2007), is misplaced.  There we addressed the issue of whether FERC had authority to order refunds from the City of Vernon for overcollection of its transmission revenue requirement.  *Id.* at 665.  We held that FERC did not have such authority because municipalities such as the City of Vernon were *explicitly* exempted from FERC's refund authority under FPA § 201(f), 16 U.S.C. § 824(f).  *Id.* at 674.  No such exemption appears present here.  As a FERC licensee the District is subject to FERC's full FPA Part I jurisdiction. 16 U.S.C. § 799.

Equally misplaced is Albany's reliance on *California ex rel. Lockyer v. FERC*, 383 F.3d 1006 (9th Cir. 2004).  There the Ninth Circuit addressed rates that purportedly complied with the FERC-approved "market-based tariff system," but which, California alleged, actually manifested "artificial manipulation on a massive scale."  *Id.* at 1012, 1014.  Under such a scenario, the court understandably saw FERC's authority to enforce the filed-rate doctrine as enabling it to order refunds to remedy the alleged de facto violation of the doctrine.  *Id.* at 1015–16.  The decision by no means compels a finding that FERC can order refunds of rates collected under the authority of a *state law* that is preempted by a federal statute.

Thus we leave the issue of an appropriate remedy for FERC to resolve on remand, in light of the much broader preemption that we find compared to what FERC assumed.

\* \* \*

FERC's judgment below is therefore reversed in part and remanded for further proceedings not inconsistent with this judgment.

*So ordered.*

BROWN, *Circuit Judge*, concurring in the judgment:  I am loath to write separately from the majority's well-penned opinion, particularly given the oft-befuddling pleadings and record in this case.  But it is because of that confusion that I am writing separately.  FERC has not adequately explained what it has wrought.  Thus, like the majority, I believe a remand is in order, but I am not yet willing to say that FERC's orders are irredeemable, or that at this time we need resolve the scope of § 10(f)'s preemption.  Instead, I think we should remand and let FERC better explain itself before we decide anything more.

The deep problem is that there is a logical disconnect between the front and back ends of FERC's orders.  The reasoning underlying the two parts seem to be in conflict. In particular, FERC (1) set forth a lengthy preemption analysis, but (2) then explained that "even to the extent that [the District's assessment system] is preempted by section 10(f), [FERC] ha[s] no authority over the District's actions." *Order on Rehearing*, 119 FERC ¶61,141 at P 55.  If by this explanation FERC meant that it lacks authority to compel its licensees to follow the Federal Power Act, then that is obviously ridiculous.  But if FERC meant something more subtle, which it very well might have, then it has not adequately explained itself.

As I read the record, I conclude FERC intended its remedies determination to be independent from its preemption determination.  I simply do not know how else to read FERC's Order on Rehearing.  In it, FERC frankly acknowledged it found the "District's assessment system" not "entirely compatible with section 10(f)," but nonetheless denied Albany any relief, even for that acknowledged incompatibility.  *Id.*  The majority remands, believing its holding that § 10(f) requires total preemption materially changes this case's context, but that interpretation of FERC's orders does not comfortably jibe with what FERC said:

"[E]ven to the extent that [the District's assessment system] is preempted by section 10(f), [FERC] ha[s] no authority over the District's actions."

I have struggled to understand what FERC meant by saying preemption does not matter, and this is what I believe FERC *might* have intended: § 10(f) requires headwater benefits assessments paid from downstream licensees to upstream licensees for "interest, maintenance, and depreciation," to be equitable. However, without a headwater benefits determination or settlement, FERC does not know what fees are appropriate under § 10(f), as it does not know how much the downstream beneficiary is benefited. A headwater benefits investigation—and thus determination—only can occur if a licensee requests it. Without a request, there is no determination; without a determination, FERC has no authority to forbid an upstream licensee from charging fees on a downstream licensee, because it does not *know* whether fees repugnant to § 10(f) are being assessed, and consequently the question of preemption is premature until FERC has determined headwater benefits. Thus, FERC said it had "no authority to prevent a storage project from attempting to assess charges from downstream projects under color of state law *and in the absence of a Commission headwater benefits determination*." *Order*, 117 FERC ¶61,321 at P 55. (emphasis added).

Laying aside for the moment the question of whether this proposed logic is actually FERC's position (or if it is, whether it is reasonable), for this analysis to be internally credible, a couple of things must be true. First, it does not matter how an upstream licensee labels a headwater benefits charge, but only the amount. In other words, if the District sends a "headwater benefits" bill to Albany for only "operations" costs, but the District is entitled under § 10(f) to the exact same amount of

money for "interest, maintenance, and depreciation," then there would be no factual need to discuss preemption. It is only when a fee—assessed under color of state law—is greater in amount than what is required by § 10(f) that a question of preemption must be resolved.

Second, FERC need not conduct a headwater benefits investigation on its own accord. This clearly is FERC's position, but it is a curious one under the statute.[1] Nonetheless, no one in this case has challenged FERC's narrow interpretation of its role, and it is likely that no licensee ever will. After all, if the expected benefit of a headwater benefits investigation is greater than the expected costs, a licensee will request one. But if not, no licensee will *want* one.

---

[1] Section 10(f) says "whenever any licensee . . . is directly benefited by the construction work of another licensee . . . the Commission *shall* require as a condition of the license that the licensee so benefited shall reimburse the owner of such reservoir . . . for interest, maintenance, and depreciation . . . as the Commission may deem equitable." Then, "[t]he proportion of such charges . . . *shall* be determined by the Commission. The licensees . . . *shall* pay to the United States the cost of making such determination as fixed by the Commission." *Id.*

Three times this short statute says "shall." Thus, § 10(f) seems to requires that if a downstream licensee receives headwater benefits from an upstream licensee, FERC *must*, as a condition to licensing that downstream beneficiary, ensure that the upstream licensee is equitably compensated, with the licensees paying FERC for the costs of any requisite headwater benefits investigation. But FERC reads for itself a passive role. Unless one of the licensees requests a headwater benefits investigation, FERC does … nothing, even when the licensees are in conflict as to the equitable assessment. *See Order*, 117 FERC ¶61,321 at P 55 ("[W]e do not undertake a headwater benefits determination for benefits from a non-federal storage project in the absence of a request to do so.").

An interesting thing happens, however, when FERC does not conduct a headwater benefits investigation, but instead allows the licensees to negotiate a settlement, with FERC only conducting an investigation if one of the licensees requests it. A "windfall" is created, which must go to either the upstream or the downstream licensee. Who receives the windfall depends on which licensee is benefited by the status quo.

To illustrate, consider this hypothetical. Assume a river on which there is only one upstream licensee, and one downstream licensee, and they both have perfect information about each other, and about how much a headwater benefits investigation will cost.[2] Assume further that a downstream licensee is, and will be in perpetuity, benefited $20,000 a year from the upstream licensee's expenditures on "interest, maintenance, and depreciation"—costs clearly covered by § 10(f)—but that a headwater benefits investigation will cost the upstream and downstream licensees $250,000 each. For simplicity, assume under § 10(f) that the "equitable" rate of compensation between downstream and upstream licensees for headwater benefits is 100% (in fact, the percentage is lower, but that is of no consequence). Next assume that the interest rate is 10%, and that state law permits the upstream licensee to assess benefits from the downstream licensee.

If, in this hypothetical, the status quo favors the downstream beneficiary (i.e., by not allowing any charges until a headwater benefits investigation has happened or the

---

[2] Of course, in real life, there is imperfect information. But unless there is cause to believe that either the upstream or downstream licensee has a systematic advantage in obtaining accurate information, then this may not be much of a problem: if the same uncertainty is built into both sides of the equation, it cancels out.

licensees have settled), then a rational upstream licensee will not request a determination. By investing that $250,000, the upstream licensee will receive annual payments of $25,000, more than it would receive if it requested a determination. The downstream licensee will know this, and thus, in settlement conversations, will agree to pay nothing, because it will know the upstream licensee has no credible threat. The result is a windfall for the downstream licensee: it does not have to compensate the upstream licensee at all.

If the status quo is reversed (i.e., by allowing any charges until a headwater benefits investigation has happened or the licensees have settled), then the upstream licensee receives the windfall: it will request something less than $45,000 a year—say, $44,000—from the downstream licensee (the $20,000 in headwater benefits, plus a share of the cost of a headwater benefits determination). If the request is greater than that, the downstream licensee will seek a determination. But as long as the amount charged is less than that, the upstream licensee will know that any threat by the downstream licensee to go to FERC for an investigation is empty. It would not be economically rational. Thus, the upstream licensee gains the windfall: the amount above the actual benefits.

Assuming that FERC need not undertake a headwater benefits investigation on its own accord, which again no party has contested, then which placement of the status quo is more reasonable under federal law? If a downstream licensee is favored by the status quo, then it would be "directly benefited by the construction work of another licensee," but "the licensee so benefited" would not "reimburse the owner of such reservoir" for those benefits, contrary to § 10(f). If the status quo preference is reversed, the upstream licensee receives the windfall. But, importantly, that result is

preferable for the downstream licensee as compared to the alternative possibility of universal headwater benefits determinations. And because the upstream licensee is the creator of the benefit, it makes some intuitive sense that the windfall goes to it. Or at least that might be a reasonable reading of the statute. After all, if a downstream licensee receives headwater benefits, then every day the upstream licensee is not compensated is a violation of federal law.

So, back to the case at hand, what if FERC had responded to Albany's complaint by saying something really simple? "Even if Albany is right that these charges *may* in fact be preempted, we will not get involved until Albany has requested a headwater benefits investigation, because we do not know *for certain* how much the District is entitled to under § 10(f). Without knowing how much the District is entitled to under § 10(f), we do not know whether there are even any charges beyond those the District is already entitled to, so, as a factual matter, there may be no need to discuss preemption at all." On review, we would not rule on preemption. My understanding of the record is that FERC may have said essentially what I have just outlined, with the only difference being that instead of holding its tongue on preemption, FERC gave its view. Unfortunately, in giving its view on preemption in the front-end of its orders, FERC undermined the logic of its back-end analysis: that preemption is premature.

For instance, instead of saying that it is irrelevant how an upstream licensee labels its headwater benefit fees because it only matters whether the amount is greater than what is actually due under § 10(f), FERC expounded at length on preemption, treating operations costs as different than those for "interest, maintenance, and depreciation," and explaining why operation costs are not preempted. In other words,

FERC actually answered the question it need not have answered, and it did so in a way that contradicted the most plausible reason why an antecedent headwater benefits determination might have mattered. That is incoherence.

Next, instead of explaining why a headwater benefits determination was required before it would intervene on Albany's behalf, FERC offered nothing but the most cursory of analysis. I have pieced together what I believe may have been FERC's rationale, but I am not confident enough even to say "the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc*., 419 U.S. 281, 286 (1974). Instead, while I believe FERC meant *something* when it said that preemption did not matter to its decision to deny Albany relief, and while I may be able to hazard an educated guess, I do not feel comfortable in saying this is what FERC *must* have meant. Pablo Picasso purportedly said "If I spit, they will take my spit and frame it as great art." Likewise here, I do not know if FERC has offered a plausible argument, or a Rorschach inkblot.

And it matters what FERC meant. If FERC intended to say that preemption was irrelevant without a headwater benefits determination because until there is that determination, no one knows whether the District has requested fees it is not entitled to under § 10(f), then there might be no need for this court to decide whether FERC erred in denying Albany's requested relief because its preemption analysis went awry. Instead, it would be as if FERC said nothing at all about preemption. Thus, for purposes of judicial economy I would remand without deciding the scope of preemption, to let FERC explain itself anew, and better.