# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 25, 2017          Decided December 22, 2017

No. 16-1015

ERIE BOULEVARD HYDROPOWER, LP,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

HUDSON RIVER-BLACK RIVER REGULATING DISTRICT,
INTERVENOR

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Ariel N. Lavinbuk* argued the cause for the petitioner. *Roy T. Englert Jr.* and *Peter B. Siegal* were with him on brief. *John A. Whittaker, IV* entered an appearance.

*Elizabeth E. Rylander*, Attorney, Federal Energy Regulatory Commission, argued the cause for the respondent. *Robert H. Solomon*, Solicitor, was with her on brief.

*Frederick A. Brodie*, Assistant Solicitor General, Office of the Attorney General for the State of New York, argued the cause for the intervenor. *Eric T. Schneiderman*, Attorney

General, *Barbara D. Underwood*, Solicitor General, and *Victor Paladino*, Assistant Solicitor General, were with him on brief.

Before: HENDERSON and MILLETT, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: This hydroelectric dispute arises from the banks of the Sacandaga and Hudson Rivers and the ripples of our decision in *Albany Engineering Corp. v. FERC*, 548 F.3d 1071 (D.C. Cir. 2008) (*Albany*). The petitioner is Erie Boulevard Hydropower, LP (Erie), which operates a series of dams that lie downstream from the Conklingville Dam (Dam) in the Hudson River basin. The Dam is operated by the Hudson River-Black River Regulating District (District), which appears as an intervenor herein. The respondent is the Federal Energy Regulatory Commission (FERC or Commission).

Before our *Albany* decision, parallel federal and New York state regulatory regimes required downstream hydroelectric facilities (*e.g.*, Erie) to reimburse their headwater counterparts (*e.g.*, the District) for certain costs. *Albany* changed that dual-track regulatory scheme by holding that the New York State assessment regime is preempted by section 10(f) of the Federal Power Act (FPA), which entitles the District to recover only "interest, maintenance, and depreciation" costs. *Id.*; *see* 16 U.S.C. § 803(f). In the wake of *Albany*, Erie petitioned FERC to credit it for costs the District had assessed it in excess of the federally mandated costs. In 2015, after a lengthy administrative process, the Commission denied Erie's request and denied rehearing. In doing so, the Commission relied on the fact that Erie and the District had formally settled their state law dispute over headwater charges in 2006. Erie then

petitioned this Court to vacate the Commission's orders. For the reasons set forth below, we deny Erie's petition.

## I.  BACKGROUND

In the early twentieth century, the State of New York built the Dam on the Sacandaga River. The Dam flooded the upstream river plain and created the Great Sacandaga Lake (Lake). New York established the District to operate the Dam, which it has done from 1930 to the present.

The FPA prohibits the unlicensed construction, operation or maintenance of any "dam, water conduit, reservoir, power house, or other works incidental thereto across, along, or in any of the navigable waters of the United States." 16 U.S.C. § 817(1). In 1993, Erie's predecessor, Niagara Mohawk Power Corporation, applied to FERC for a license to operate the E.J. West power facility immediately downstream from the Dam.[1] During the application process, FERC determined that the Dam and the Lake were part of the same hydroelectric "project" as the E.J. West facility and that the FPA therefore required the District to license them as well. *See* 16 U.S.C. § 796(11). After almost a decade of administrative proceedings, in 2002, FERC granted licenses to Erie (for the E.J. West project) and to the District (for the Dam and the Lake).

Erie operates four FERC-licensed projects downstream from the Dam: (1) E.J. West (Project No. 2318); (2) Stewarts Bridge (Project No. 2047); (3) Hudson River (Project No.

---

[1]  Niagara Mohawk transferred the E.J. West facility (and three other facilities) to Erie in 1999.

2482);[2] and (4) Feeder Dam (Project No. 2554). Since the Commission issued the District's license in 2002, the interaction between Erie and the District has been contentious. Their conflict has played out in state court, in federal court and before FERC.

## A. REGULATORY FRAMEWORK

In the world of hydroelectricity, "[a]n upstream dam typically will render the downstream flow more even and predictable, enabling downstream hydropower plants to operate at a higher capacity." *Albany*, 548 F.3d at 1072. When a downstream FERC licensee benefits from the regulated flow caused by an upstream dam (headwater benefits), the FPA authorizes the upstream FERC-licensed dam operator (upstream operator) to collect reimbursement for certain costs. 16 U.S.C. § 803(f). Specifically, section 10(f) of the FPA provides that the Commission "shall require" downstream licensees that benefit from an upstream operator's "reservoir or other improvements" to reimburse the upstream operator "for such part of the annual charges for interest, maintenance, and depreciation thereon as the Commission may deem equitable." *Id.* In other words, because the headwater dam enables the downstream facility to produce additional energy, the downstream licensee reciprocates by paying for a portion of the upstream operator's costs. *Id.*

Commission regulations establish two procedures for calculating reimbursable headwater benefits costs. *See generally* 18 C.F.R. §§ 11.10-11.17. The preferred method is for the upstream and downstream licensees to negotiate a

---

[2] The Hudson River Project contains two facilities, Spier Falls and Sherman Island Developments, which are covered by the same license.

settlement and submit it to the Commission for approval under FERC Rule 602. *Id.* § 11.14 (incorporating *id.* § 385.602). Alternatively, if the parties are unable to settle, they can petition FERC to conduct a headwater benefits investigation in order to determine the correct charges. *Id.* § 11.15. The cost of the investigation is apportioned equally between the FERC-licensed headwater project owner and the collective downstream recipients of the headwater benefits. *Id.* § 11.17(c)(2). After conducting the investigation, the Commission sets reimbursable costs based on a formula that balances the energy gains for the downstream licensee against the specified costs associated with the upstream dam operator. *Id.* § 11.11(b).

## B. STATE COURT LITIGATION AND 2006 SETTLEMENT

Before *Albany*, the District assessed headwater benefits charges against Erie and other downstream operators on the Sacandaga and Hudson Rivers pursuant to the New York State Environmental Conservation Law. *See Albany*, 548 F.3d at 1078. In New York State court, Erie challenged the District's budget, assessment and apportionment used to determine headwater benefits for each of the six budget years from 2000-06.[3] The parties eventually settled the state court litigation and the Fulton County State Supreme Court approved their settlement agreement (Agreement) in a Stipulated Settlement and Order (Settlement Order) dated May 30, 2006. Joint Appendix (JA) 349-57.

The Agreement provided benefits to both parties. Erie received: (1) $822,220 as credits applying to the District's assessments for the three-year period 2006-09; (2) an

---

[3] Although the District's federal license did not issue until 2002, it assessed state headwater benefits charges in 2000-02.

additional $140,220 "in the form of a reduction in assessment of $46,740.00" for each of the budget years from 2007-09; and (3) the execution of a separate document entitled "Amendment to Reservoir Operating Agreement and Letter Agreement," which gave Erie a beneficial extension thereto.  JA 350-53. In return, Erie agreed to two broad release clauses:

> 10.    Each of the Parties, on behalf of itself and on behalf of any person or entity claiming by, through or under it, does hereby release and forever discharge each of the other Parties, and their respective officers, directors, trustees . . . [etc.] from any and all claims, demands, judgments, liabilities, damages, and causes of action of every kind and character, whether such claims arise in contract or in tort, are founded upon statutory or common law, or whether such claims are known or unknown, at law or in equity . . . arising out of or in any way related to the District's budgets, assessments, and apportionments for the budget years July 1, 2000 to June 30, 2001, July 1, 2001 to June 30, 2002, July 1, 2002 to June 30, 2003, July 1, 2004 to June 20, 2005, and July 1, 2005 to June 30, 2006, which such Party may now have against the Released Parties (to the extent that such claims originated in whole or in part or, based on presently existing facts, that could have originated in whole or in part on or before the date hereof).

> . . .

> 13.    [Erie] agrees to waive any future challenges or claims with respect to the

> District's July 1, 2006 to June 30, 2007, July 1,
> 2007 to June 30, 2008, and July 1, 2008 to June
> 30, 2009 budgets, assessments, and/or
> apportionments and agrees not to bring any
> lawsuit or legal action of any kind challenging,
> contesting or disputing the District's budgets,
> assessments and/or apportionments for the
> period July 1, 2006 to June 20, 2009.

JA 353-54. In Paragraph 15, the parties further agreed to make the Settlement Order "inadmissible in any subsequent action or proceeding before any court of law or administrative body, except . . . in any action or proceeding for enforcement of its provisions." JA 354. Finally, the Settlement Order provides that "the settlement of these proceedings is hereby approved as just, reasonable and to be in the best interests of the Parties." JA 355.

## C. ALBANY ENGINEERING CORPORATION

Similarly displeased with the District's state headwater benefits assessments, another downstream licensee, Albany Engineering Corporation (Albany), challenged the District's charges before the Commission.[4] *See Albany*, 548 F.3d at 1071. Albany argued that section 10(f) of the FPA preempts all state headwater benefits assessments as a matter of law. *Id.* at 1073. The Commission agreed in part. It held that section 10(f) preempts state law "*only* insofar as the state authorize[s] charges for interest, maintenance, and depreciation"; it left states free, however, to charge FERC licensees for "all headwater improvement costs not fitting into" those three

---

[4] On August 1, 2006, Erie moved to intervene in Albany's proceedings before the Commission. *See* Pet'r's Supp. App'x, Ex. A at 1 (filed post-argument pursuant to Court's Sept. 26, 2017 order).

categories. *Id.* (emphasis in original). Albany petitioned for review and this Court granted its petition. *Id.*

In reviewing the FPA's legislative history, this Court determined that the FPA "manifest[ed] a deliberate congressional decision to balance the goal of compensating upstream owners (and thus encouraging their investment) and that of protecting downstream ones (and thus encouraging their investment)." *Id.* at 1076. We therefore held that section 10(f) preempts *in toto* any state law that authorizes headwater benefits charges.[5] *Id.* at 1073. On the issue of remedies, however, the Court punted, declaring:

> We do not reach FERC's decision to neither order refunds for Albany's past payments to the District nor convene a settlement conference. FERC reasoned that § 10(f) does not grant it the authority to address independent actions taken by an upstream licensee to collect charges under color of state law absent a headwater benefits investigation.

*Id.* at 1079 (internal quotation marks omitted). Thus, because we concluded that "state law is in fact preempted *in its entirety*," we remanded the case to the Commission to determine whether section 10(f) "may grant FERC some

---

[5] "Federal preemption can be express or implied." *Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc.*, 168 F.3d 1362, 1369 (D.C. Cir.), *opinion amended on denial of reh'g*, 177 F.3d 1036 (D.C. Cir. 1999). *Albany* is an implied preemption decision because the text of the FPA is silent as to preemption but we nonetheless concluded in that case that the Congress's "commitment to comprehensive federal regulation" in the FPA left no room for "disparate state reimbursement schemes." *Albany*, 548 F.3d at 1076.

authority over the District's [preempted] actions." *Id.* at 1080 (emphasis in original).

Judge Brown concurred in the judgment. She took issue, primarily, with the clarity of FERC's decision that it did not have authority over the District's charges. *Albany*, 548 F.3d at 1081 (Brown, J., concurring). "If by this explanation FERC meant that it lacks authority to compel its licensees to follow the Federal Power Act, then that is obviously ridiculous. But if FERC meant something more subtle . . . then it has not adequately explained itself." *Id.* On this point, she declared: "I do not know if FERC has offered a plausible argument, or a Rorschach inkblot." *Id.* at 1084. She concluded that she "would remand without deciding the scope of preemption, to let FERC explain itself anew, and better." *Id.* She also traced the root of the dispute to FERC's inexplicable inaction in the face of statutory language requiring it to ensure that the upstream operator is equitably compensated. *Id.* at 1082 n.1.[6]

On remand, Albany again requested that FERC order the District to refund the unauthorized state law assessments it had theretofore paid.[7] The Commission again demurred and

---

[6] Although FERC licensed the Dam in 2002, it did not begin the process of investigating energy gains and calculating headwater benefits charges until 2009. *See generally Albany Eng'g Corp. v. Hudson River-Black River Regulating Dist.*, 127 FERC ¶ 61,174 (May 19, 2009) (May 2009 Order).

[7] After the *Albany* remand, Erie filed another motion to intervene and answer with FERC to ensure its participation in Commission proceedings continued. *See* Pet'r's Supp. App'x, Ex. B at 5 n.2 ("Erie notes that it . . . should already be considered a party to any remand proceeding. Erie is submitting this motion to intervene out of an abundance of caution in the event such party

denied Albany's request. *See Albany Eng'g Corp. v. Hudson River-Black River Regulating Dist.*, 127 FERC ¶ 61,174 at PP 26, 28 (May 19, 2009) (footnotes omitted) (May 2009 Order). It denied Albany's rehearing request as well. *Albany Reh'g Order on Remand*, 129 FERC ¶ 61,134 at P 26 (Nov. 19, 2009) (November 2009 Order).

Albany then turned to state court. Its efforts there were more successful. The Supreme Court of Albany County held: "The Court of Appeals [for the D.C. Circuit] clearly stated that the assessment levied by the District for the years 2003-07 was in violation of federal law. Since the levies were unlawful, the plaintiff was entitled to refunds for those assessments previously paid." *Albany Eng'g Corp. v. Hudson River-Black River Regulating Dist.*, RJI No. 01-12-105799 at 7, 2012 WL 1144735 (N.Y. Sup. Ct. Apr. 2, 2012). Accordingly, the Albany County Supreme Court entered judgment for Albany.[8] *Id.*

As its May 2009 and November 2009 Orders manifest, the Commission continued to maintain that it lacked authority to order refunds for the District's unauthorized assessments under state law. The Commission did suggest, however, that it "may be able, at the conclusion of a headwater benefits investigation, to permit Albany Engineering to offset amounts it owes by the

---

status is not deemed to extend to the remand proceedings"). Erie's motion did not address the 2006 Settlement.

[8] The New York Supreme Court, Appellate Division, eventually affirmed but remanded the case to "determine defendant's entitlement to an offset of the amount owed based on the outcome of the headwaters benefit investigation completed by FERC." *Albany Eng'g Corp. v. Hudson River-Black River Regulating Dist.*, 973 N.Y.S.2d 391, 394 (N.Y. App. Div. 2013).

amounts it has paid to the District." *May 2009 Order*, 127 FERC ¶ 61,174 at P 19. In short, the Commission proposed a crediting scheme whereby Albany's 2002-08 overpayments could be offset against the District's *future* section 10(f) assessments.

To that end, the Commission's May 2009 Order authorized proceedings before a settlement judge "to assist the parties and other owners of projects in the affected river basin in reaching a headwater benefits settlement. Failing an agreement, Commission staff [was] directed to institute a headwater benefits investigation." *Id.* at P 3. As earlier discussed, the November 2009 Order denying rehearing prompted Albany to turn to state court for its refund. Meanwhile, the other downstream licensees, including Erie, began FERC-initiated settlement discussions with the District but the discussions were not successful. Accordingly, in 2009, the Commission began its headwater benefits investigation to "determine the appropriate headwater benefits payments for these projects." *Id.*

### D. PROCEEDINGS BEFORE FERC ON REMAND (2012)

After three years of data collection and draft reports, the Commission issued an order determining headwater benefits. *Order Determining Headwater Benefits in the Hudson River Basin*, 140 FERC ¶ 62,089 at P 44 (July 31, 2012) (July 2012 Order). Among other things, the July 2012 Order declared that, during the 2002-08 period, the Conklingville Dam and Great Sacandaga Lake Project had provided Erie's downstream projects with a total of $1,849,640 in section 10(f) headwater benefits. *Id.* at PP 39-42. The July 2012 Order also calculated Erie's interim headwater assessment to be $365,100 per year from 2012 on. *Id.*

In response to a draft of the July 2012 Order, the District had requested that the Commission "defer consideration of whether, and how, prior payments under [New York law] would be credited against Headwater Benefit charges until after the amount of those charges has been finally settled." *See* Letter from Robert S. Foltan, District's Chief Engineer, to Kimberly D. Bose, Secretary of FERC (Mar. 16, 2012). The District also sought to reserve its right to limit the amount of credits for payments made before the *Albany* decision. Although the Commission denied the District's request, it did not order a final payment schedule for the downstream licensees. It did, however, calculate benefits and set forth a method for determining credits:

> To the extent that downstream project owners have already paid the District under New York law for what were, incontestably, headwater benefits, requiring those project owners to pay the District yet again for headwater benefits for those years, this time under section 10(f), would amount to a double payment that could not be reconciled with the Commission's responsibility to ensure reimbursements that are "equitable." Moreover, to the extent that, while the [project] has been under license, any of the downstream project owners made payments exceeding the amounts that this order finds were owed for those years, those overpayments, equitably, should be offset against future charges.

*July 2012 Order*, 140 FERC ¶ 62,089 at P 44.

The Commission made four additional points. First, it noted that it could not determine the full extent of the licensees'

credits without more information because the payment records for 2002-08 were not in the record. Relatedly, it noted that downstream licensees "may already have obtained refunds from the District through court action or other means." *Id.* at P 45. Second, the Commission directed the downstream licensees to contact the District and attempt to settle the outstanding charges based on its calculation of headwater benefits. Third, if settlement negotiations failed, the Commission noted that it intended to request the necessary information from the parties and establish a headwater benefits payment schedule "that reflects the annual amounts that staff has determined would be owed to the District and the amounts that have already been paid." *Id.* at P 48. Fourth, and finally, the Commission iterated that no headwater benefits settlement was final until and unless it was filed with the Commission for approval.

### E. FEDERAL COURT LITIGATION

On January 21, 2014, the District initiated a declaratory judgment action against Erie in the Fulton County Supreme Court. *See Hudson River-Black River Regulating Dist. v. Erie Boulevard Hydropower, L.P.*, No. 6:14-CV-173, 2014 WL 5502375, at *1 (N.D.N.Y. Oct. 30, 2014). The District's complaint asked the court to give effect to the parties' 2006 Settlement Agreement and preclude Erie from claiming refunds for the years 2000-09. *Id.* at *2. Erie removed the case to the United States District Court for the Northern District of New York and moved to dismiss. *Id.*

In response to the motion to dismiss, the District proposed that the court enter a consent order dismissing the litigation "on the specific ground that the entire Settlement Agreement is unenforceable as preempted by the [FPA]." *Id.* Erie opposed the District's proposal, claiming that "only the portion of the

2006 Settlement Agreement that deals with headwater benefits assessments—not the entire document—is unenforceable." *Id.*

Ultimately, the court dismissed the case as moot because Erie was seeking credits rather than a refund. *Id.* at *3. The court further held that, even if the case were not moot, it would abstain from deciding the issue because of the then-pending FERC proceeding. *Id.*

## F.  FERC'S 2015 ORDERS

This 15-year saga culminated in the two 2015 orders *sub judice*. Notwithstanding the Commission's effort to promote a settlement through its July 2012 Order, the parties were unable to settle their dispute. On October 31, 2012, Erie notified the Commission that: (1) the parties' attempts to settle the dispute had failed; (2) Erie had paid the District $9,146,507.98 between 2002 and 2008; and (3) once the Commission's section 10(f) assessments of $1,849,640 were subtracted, Erie was entitled to $7,296,867.98 in credits towards future District assessments. The District responded by stating that there had been no overpayments because Erie's claims had been resolved through the 2006 Settlement Order.

After evaluating the parties' arguments with respect to the Settlement Order, the Commission concluded that it was "reasonable and equitable to hold [Erie] and the District to the bargain they struck regarding these payments." *Order Calculating Dates for Commencement of Headwater Benefits Assessments*, 152 FERC ¶ 62,124 at P 19 (Aug. 21, 2015) (August 2015 Order). The Commission further noted that its "determination of what is fair and equitable in this case in no way affects the validity of the 2006 Settlement." *Id.* at P 20. Importantly, it held that its decision did not constitute a headwater benefits settlement submitted for approval pursuant

to Commission Rule 602. *Id.* Its decision not to award credits was unique to Erie; because the other downstream operators had not settled their state law claims, the Commission credited them for their overpayments. *Id.* at PP 21-30.

Thereafter, Erie filed a timely request for rehearing and for a stay of the August 2015 Order. *Order on Reh'g and Dismissing Motion for Stay*, 153 FERC ¶ 61,218 (Nov. 19, 2015) (November 2015 Order). In its motion, Erie made nine assignments of error. Other than an issue regarding Erie's Glens Falls Project (which was not part of the 2006 Settlement), the Commission rejected all of Erie's arguments, denied rehearing and dismissed the stay motion. *Id.* at P 64. Erie then petitioned for review.

## II.  ANALYSIS

Our jurisdiction to review the Commission's final orders arises under 16 U.S.C. § 825*l*(b). We review an agency's exercise of statutory authority pursuant to section 706 of the Administrative Procedure Act. 5 U.S.C. § 706(2). We must set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(A), (C); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983). But we must uphold an agency's decision if there is a "'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Erie asserts four grounds to grant its petition, seeking to vacate the Commission's two 2015 orders. It argues that they run contrary to: (1) section 10(f) of the FPA; (2) the 2006 Settlement; (3) the Commission's regulations; and (4) a "legion

of prior, unchallenged Commission orders." Unlike the Dam, Erie's arguments do not hold water.

## A. FEDERAL POWER ACT, SECTION 10(F)

Erie first argues that the District's collection of state headwater benefits assessments violated the FPA notwithstanding the fact that Erie formally settled its challenges to the District's state-law assessments in 2006.

A federal court's preemption decision ordinarily does not undo independent contractual obligations. *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 222 (1995). In *Wolens*, the United States Supreme Court held "that the [Airline Deregulation Act's] preemption prescription bars state-imposed regulation of air carriers, but allows room for court enforcement of contract terms set by the parties themselves." *Id.* The Court reaffirmed this principle in 2013, when, for preemption purposes, it drew "a rough line between a government's exercise of regulatory authority and its own contract-based participation in a market." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 133 S.Ct. 2096, 2102 (2013).

Like *Wolens*, *Albany* is a preemption decision. *See supra* note 5; *Albany*, 548 F.3d at 1077. In effect, *Albany* invalidated the provisions of New York's Environmental Conservation Law that "conflict[ed] with the FPA's purpose to provide for a comprehensive legislative scheme to govern the nation's hydropower development." *Albany*, 548 F.3d at 1079. *Albany* went no further than that. *Id.* ("We do not reach FERC's decision to neither order refunds for Albany's past payments to the District nor convene a settlement conference."). Indeed, there is nothing in *Albany* that unravels the District's contractual rights or affects the finality of its previous litigation. *Id.* Instead, *Albany* left FERC free

to use the full scope of its equitable authority to craft a remedy. *Id.*

Although Erie does not directly challenge FERC's authority to establish a crediting regime, we begin by examining that authority because it defines the scope of FERC's equitable discretion under the FPA. The FPA grants the Commission broad discretion in setting the rate of headwater benefits assessments so long as the charges consist of "interest, maintenance, and depreciation." *Id.* Specifically, section 10(f) allows the Commission to set the assessments "*as the Commission may deem equitable. The proportion of such charges to be paid by any licensee shall be determined by the Commission.*" 16 U.S.C. § 803(f) (emphasis added). Thus, the statute differentiates between FERC's *calculation* of "interest, maintenance, and depreciation" and FERC's equitable power to *assess* only a portion thereof. It is under its equitable power granted by section 10(f) that the Commission established its policy of crediting downstream licensees for their state overpayments to the District. *July 2012 Order*, 140 FERC ¶ 62,089 at P 44.

The distinction between straightforward calculations and equitable assessments makes perfect sense in the context of this case. Under the FPA, the mathematical formula for determining headwater benefits charges is set out in regulations promulgated in 1986. *See generally* 18 C.F.R. § 11.11. *Albany* forced FERC to finally calculate section 10(f) assessments after six years of inaction. *See Albany*, 548 F.3d at 1083 (Brown, J., concurring) (explaining why the FPA does not incentivize licensees to seek a headwater benefits investigation when FERC does not act on its own). Accordingly, the downstream licensees turned to FERC once *Albany* effectively told them to do so in order to calculate their future payments. *Id.* at 1080-81. In response, the

Commission implemented a one-time equitable program that credited downstream licensees for future headwater benefits charges. The standard headwater benefits *calculation* remained the same but the Commission invoked its equitable authority to award credits against the overpayments we identified in *Albany*. We believe its crediting scheme easily falls within FERC's FPA-granted equitable authority.

## B.   2006 SETTLEMENT

Having established that the FPA authorizes FERC to grant credits, the question becomes whether FERC was arbitrary and capricious in *declining* Erie's request for credits based on Erie's 2006 Settlement with the District. We conclude it was not.

"[T]his court has consistently required the Commission to give weight to the contracts and settlements of the parties before it." *Tejas Power Corp. v. FERC*, 908 F.2d 998, 1003 (D.C. Cir. 1990). We have held that "[i]t is perverse . . . to reject a settlement because later developments make one party's decision appear unwise." *Panhandle Eastern Pipe Line Co. v. FERC*, 95 F.3d 62, 74 (D.C. Cir. 1996). Applying this principle in *Burlington Resources Inc. v. FERC*, we required FERC to approve a private settlement even though the settlement was based, in part, on charges that were later found to exceed the maximum price ceiling mandated by the National Gas Policy Act. 513 F.3d 243, 244 (D.C. Cir. 2008). Thus, even if the legal underpinning of a settlement has eroded, the settlement remains intact before the Commission. *See id.*; *see also Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 758 (1995) ("New legal principles, even when applied retroactively, do not apply to cases already closed.").

Moreover, as a contractual matter, it is well settled under New York law that "a change in the law does not render an

agreement void." *Anita Founds., Inc. v. ILGWU Nat'l Ret. Fund,* 902 F.2d 185, 189 (2d Cir. 1990). Thus, the state court's Settlement Order is "enforceable according to its terms," notwithstanding our *Albany* decision, *McKenzie v. Vintage Hallmark, PLC*, 755 N.Y.S.2d 288, 289 (Mem.) (N.Y. App. Div. 2003), and we interpret its terms in accordance with their plain meaning, *Vider v. Vider*, 846 N.Y.S.2d 666, 667 (N.Y. App. Div. 2007).

Erie points to the language of the Settlement Agreement in challenging the remedy FERC adopted. It argues that its request in this case does not constitute a "claim" against the District within the meaning of Paragraphs 10 and 13 of the Agreement and suggests that FERC was not obligated to enforce the Agreement against Erie.[9] We read the language differently. In the Settlement Agreement, Erie released "any and all claims, demands, judgments, liabilities, damages, and causes action of every kind and character . . . arising out of or in any way related to the District's . . . assessments" for 2000-06. JA 353. This is broad language and it does not stop there; it further waives "any future challenges or claims with respect to" 2006-09. JA 354. The issues in this case are plainly "related to the District's . . . assessments." Indeed, the District's assessments lie at the heart of the dispute because Erie requests credits for the overpayments it made based on those assessments.

Next, Erie argues that the 2006 Settlement Order is not admissible before the Commission. The parties stipulated in Paragraph 15 of the Agreement that the Settlement Order is "inadmissible in any subsequent action or proceeding before any court of law or administrative body." JA 354. Excepted from the inadmissibility provision, however, is "any action or

---

[9] As discussed *infra*, we do not believe FERC has any such obligation and it has not asserted it does.

proceeding for enforcement of [the Agreement's] provisions." *Id.* Erie asks this Court to read the provision without regard to its exception. Under the exception, it is difficult to dispute that, by denying Erie credits for its overpayments, the Commission was giving effect to, that is, enforcing the Settlement Order's waiver provision. Although the enforcement mechanism is by way of administrative proceedings, not court action, the exception applies to "any action *or proceeding* for enforcement of its provisions." *Id.* (emphasis added).

Accordingly, because the Settlement Order was properly before it, FERC was well within its authority to give it equitable effect under the FPA. Just as the legality of the charges in *Burlington* was uncertain when the parties settled, the preemptive effect of the FPA was also unclear when Erie and the District settled their state law disputes. Indeed, both parties may have settled precisely *because* the value of their respective claims was uncertain. *See Burlington*, 513 F.3d at 248 (rejecting Commission's attempt to "forbid private parties from settling claims of uncertain value"). In signing the 2006 Settlement Agreement, Erie took a calculated risk. It received both immediate and future monetary benefits as well as a valuable contract extension of its Reservoir Operating Agreement. In return, it released all of its claims against the District for the years 2000-09. By denying Erie credits, FERC did nothing other than hold Erie to its bargain. FERC's decision properly adhered to the principles set forth in *Wolens*, *Burlington* and the authorities cited above. It was neither arbitrary nor capricious.

## C. FERC'S REGULATIONS AND ORDERS

Erie next maintains that, even if the FPA and the 2006 Settlement do not require the Commission to award credits for

Erie's past state overpayments, its regulations and past orders compel it to do so.   We disagree.

"It is axiomatic  . . .   that an agency is bound by its own regulations." *Nat'l Envtl. Dev. Ass'n's Clear Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting *Panhandle E. Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979)).   Therefore, if an agency action fails to comply with its regulations, that action may be set aside as arbitrary and capricious.  *Id.*   An agency decision that departs from agency precedent without explanation is similarly arbitrary and capricious.  *See State Farm*, 463 U.S. at 41.

Erie argues that the Commission set its headwater benefits charges by using the 2006 Settlement rather than the two methods set forth in the regulations.   Because the 2006 Settlement was not—as required by Rule 602—submitted to, nor approved by, the Commission, however, Erie maintains that FERC violated its own regulations.

Erie is, first, wrong on the facts.   The Commission did not base its calculation of headwater benefits charges on the 2006 Settlement.   Instead, it conducted a three-year investigation from 2009-12 and ultimately determined the appropriate amount of headwater benefits based on cost-accounting and energy-gains data.   The procedure for the investigation was detailed in FERC's May 2009 Order on remand from *Albany* and the results of the investigation were included in the July 2012 Order.  *See July 2012 Order*, 140 FERC ¶ 62,089.   In that Order, the Commission's findings were explicit: it conducted an energy-gains analysis, made a cost assessment of the Conklingville Dam and detailed its findings in tables included in its report.  *Id.* at PP 39-42.   All told, the benefits

assessment for Erie totaled, for 2002-08, $1,849,640.[10]  *Id.*
The 2006 Settlement was not cited in the calculations and those
calculations conform to the prescribed procedure under the
regulations.

The 2006 Settlement came into play only in determining
credits against *future* headwater benefits assessments.  As
detailed in 18 C.F.R. § 11.11(a)(5), the regulations establish a
maximum headwater benefits payment based on the
downstream licensee's energy gains.[11]  Apart from that cap,
the regulations do not address "reduced" headwater benefits.
Because the Commission properly calculated headwater
benefits using the energy-gains-to-costs ratio described in the
regulations, Erie's argument that FERC did not follow its
regulations fails.

The Commission's past orders involving the District
likewise do not support Erie's petition.  Erie points to
language contained in a 2007 Order the Commission issued in
the Albany proceeding:

> [T]he fact that the District and Erie reached a
> settlement in respect to Erie's assessments does
> not affect our authority under section 10(f) to
> determine the proportion of equitable charges

---

[10]  According to FERC's calculations, Erie was required to pay
the following annual amounts: $46,898 in 2002; $199,657 in 2003;
$241,342 in 2004; $276,858 in 2005; $353,400 in 2006; $366,385 in
2007; $365,100 in 2008; and a prospective assessment of $365,100
from 2009 forward.  *July 2012 Order*, 140 FERC ¶ 62,089 at PP 39-
42.

[11]  Headwater benefits charges may not "exceed 85 percent of
the value of the energy gains."  18 C.F.R. § 11.11(a)(5).

> for interest, maintenance, and depreciation that each downstream hydropower beneficiary should pay the District. The settlement was not submitted to the Commission for approval and does not reflect a Commission determination of the charges that Erie should pay under section 10(f).

*Albany Order on Reh'g*, 119 FERC ¶ 61,141 at P 35 (May 17, 2007) (May 2007 Order). Using this language, Erie asserts that the Commission considered—and rejected—the 2006 Settlement as a basis for the section 10(f) calculations.[12] If this is true, Erie's argument goes, FERC was barred from considering the 2006 Settlement Agreement in its 2015 credit determinations.

Erie's argument is again defeated by the distinction between the calculation of headwater benefits charges under section 10(f), on the one hand, and the Commission's equitable decision to grant remedial credits, on the other. In calculating headwater benefits, the Commission's orders and regulations are clear: a settlement agreement cannot take the place of the Commission's section 10(f) calculation unless it is formally submitted to FERC under Rule 602. *See* 18 C.F.R.

---

[12] The Commission's 2007 Order did not respond to *Erie's* assertions; instead, it responded to *Albany's* argument protesting the District's headwater benefits charges. *May 2007 Order*, 119 FERC ¶ 61,141 at PP 32-36. Under New York's (now preempted) headwater benefits reimbursement scheme, downstream beneficiaries were collectively required to reimburse the headwater operator for all of the headwater operator's costs. *Id.* Because Erie's 2006 Settlement had reduced the amount it had to pay, other operators like Albany had to pay more. In the 2007 proceeding, Albany objected that this result was inequitable. *Id.*

§§ 11.11(b), 11.14. Here, the procedure was followed to a "T"; the parties could not settle their differences and, accordingly, the Commission conducted a three-year investigation and set formal section 10(f) rates in its July 2012 Order. Critically, the rates were based on energy-gains and cost-accounting data, not on the 2006 Settlement Agreement.

The remedial credits are a different matter. The credits represent the Commission's response to *Albany*, which suggested, without deciding, that the Commission has the authority to provide some remedy for downstream licensees' state overpayments. *See Albany*, 548 F.3d at 1080 ("[Section] 10(f) may grant FERC some authority over the District's actions."). Following that suggestion, FERC found support for its remedial authority in section 10(f)'s language that charges are to be assessed "as the Commission may deem equitable." 16 U.S.C. § 803(f). As earlier discussed, the basis for the remedial scheme was set forth in FERC's July 2012 Order once the full headwater benefits investigation was complete. In that same Order, the headwater benefits were calculated and remain, even today, unchallenged.

What Erie *does* challenge are the Commission's equitable reductions to those calculations. In this regard, Erie points to the following language in the July 2012 Order: "to the extent that, while the Great Sacandaga Lake Project has been under license, any of the downstream project owners made payments exceeding the amounts that this order finds were owed for those years, *those overpayments, equitably, should be offset* against future charges." *See July 2012 Order*, 140 FERC ¶ 62,089 at P 44 (emphasis added). But the July 2012 Order did not determine credit amounts and the quoted language does not tell the whole story. In the very next paragraph, the Commission noted that it *could not determine* the extent of the licensees' credits because evidence of assessments from 2002-08 was not

in the record. *Id.* at P 45. The Commission further noted that downstream licensees "may already have obtained refunds from the District through court action or other means." *Id.* The July 2012 Order set forth the framework for awarding credits but it did not fix the amount of credits due. That was done, *for the first time*, in the Commission's 2015 orders. Accordingly, the 2015 orders did not—and could not—veer from any of the Commission's earlier orders.

For the foregoing reasons, Erie's petition is denied.

*So ordered*.